Beekman, J.
The complaint alleges that in the month of May,, 1892, the defendants employed Joseph M. Davenport to perform *186 certain services for them, for which they agreed to pay him the stun of $20,000; that the services were performed by him in so far as lie was perrhitted so to do by the defendants, but that they have failed to pay him the sum so agreed upon for his compensation ; and that the claim therefor was duly assigned to the plaintiff. The defendants answered, putting in issue the validity of the alleged contract. Upon the trial, at the close of the plaintiff’s case, a motion was made by the defendants for a dismissal of the complaint, which was granted, and an exception was taken to this ruling by the plaintiff, who now appeals from the judgment entered thereon. The facts of the case, briefly stated, are as follows; At the time of the alleged contract the said Davenport was a bookkeeper in the employ of the National Cordage Company, a corporation doing a business of great magnitude, and having a capital of $15,000,000. In that capacity,' and in necessary connection with the proper performance of his duties, the transactions •of the company and its financial operations came under his observation. He kept the books in which the entries relative to .such matters were made, and the financial condition of the com-’ pony was thus revealed to him. From the knowledge thus obtained it became apparent, as he claims, that although the company had been declaring large dividends, from time to time, for several years, such action was unwarranted, as during the same period losses had been incurred amounting to many millions of dollars. It was knowledge of great financial importance, and calculated to produce a most injurious effect upon the company should it be disclosed. Of this Davenport was quite sensible. He also perceived, under certain circumstances, it had a large pecuniary value, enhanced by the fact that, with the exception of the •officers of the company, he was in the exclusive possession of the information. He proceeded to profit by the situation in the following way : The defendant Hulme had advanced a large amount •of money, some $4,000,000, to the company upon its Ronds and stock. Davenport opened communication with him, and having imparted enough information to excite serious alarm, without surrendering the commodity he came to sell, an agreement was entered into by which the particulars were to be disclosed, which was reduced to writing, signed by Davenport, and delivered to Hulme. This extraordinary document reads as follows:
“ Upon payment to me of twenty thousand dollars and selling short for me a/c 500 shares of the National Cdge. Co. at your risk, I agree to deliver to you or your order the original earnings and losses ending Oct. 31st, ’91, contained in the books of the Natl. Cdge. Co. now in my possession, and make such affidavit you may call upon me to make in support of the figures I undertake to furnish you. I also further agree not to give said figures to any other parties besides yourselves, and am willing to make an affidavit to that effect.”
The affidavit thus referred to was subsequently made ,and delivered to Hulme. It purported to verify the statement which was the subject of the contract, and referred to it as annexed. It was not, however, so annexed, but was thriftily retained by *187 Davenport until he should receive his $20,000. He was willing, however, to stimulate the eagerness of Hulme for a speedy consummation of the bargain by the following remarkable oath, which he embodied in his affidavit:
“ And said Davenport swears that he has not spoken to any one or by an action or manner in any wise divulged the information contained in said books of account, or allowed a copy of the figures in said profit and loss account referred to, to any person or persons; and, further, that he will not divulge or reveal, or disclose or give, either by writing or in any other manner, the figures or accounts of said company to any person or persons, in other than to the holder of this affidavit, after the same has been due form executed and sworn to. Davenport further says that he has no other memorandum, reference, copies of .figures or accounts, statements, or any other information, other than, the statements or copies of figures or memorandas to this affidavit annexed. And deponent solemnly swears that upon the delivery of this affidavit, and the said copies, memorandas, etc., referred to, he parts with all written or other information, except that which he might recollect of his own mind and not otherwise. And that on this day, so far as he knows or is informed, he is the only individual, outside of the National Cordage people themselves, who is the possessor of and enabled to give the information and figures stated in the papers hereto annexed and in this affidavit.”
The preliminaries having been thus satisfactorily adjusted, a date was fixed for the consummation of the bargain, but in the meantime the matter had come to the knowledge of the officers of the Cordage Company, and the vigorous steps they took to prevent the disclosure proved effective. Although the statement was tendered to Hulme, accompanied by a demand for the $20,000, he refused to proceed with the transaction or to pay the money, and this action was accordingly brought to enforce payment. We have no hesitation in condemning the agreement on which this suit is brought as absolutely void and unenforceable, and approve of the action of the trial judge in dismissing the complaint on this ground. It involved a clear betrayal of trust by Davenport, and was utterly sordid and conscienceless in its purpose and conception. He was an employe of the company, holding a place of trust and confidence. The information he had obtained in the course of the performance of his duties belonged to the company, and was not his to use against his employer or to dispose of for his own advantage. When he agreed to barter it away in the manner proposed, he not only violated an obligation to his employer springing out.of the contract of employment and the relation in which he stood to the company, but the whole transaction was, in foro conscientice, flagitious and indefensible. The law has sternly set the seal of its condemnation upon such acts. It reads into every contract of service an obligation on the part of the servant to be faithful to his employer in respect to matters within the scope of his duties, and pronounces any violation of such duty to be a breach of contract, for which the servant may be discharged. The betrayal to others of facts which have come to his knowledge in *188 the house of his employment, and which are confidential in their nature, is within this principle, which applies with peculiar force to the office of a bookkeeper. His employer is compelled to confide to him almost every 'detail of business venture and financial condition. The knowledge he thus acquires is usually of such a character as to expose the employer to loss, and possibly serious disaster, if promulgated to others. The obligation, therefore, is-proportionately great to preserve inviolate the confidence reposed in him which the performance of the' duties for which he has been employed has rendered necessary There doubtless are cases in which the prevention of fraud or other service of the ends of justice creates exceptions to the rule, but, as the case at "bar does not come within any such modifying principle, we do not consider it profitable to discuss them. A violation of duty of the character above mentioned also involves an element of moral turpitude. Railway Co. v. Lythgoe, 2 Lown. M. & P. 221. In that case, the defendant, while in the plaintiff’s employment, secretly communicated details of the business which he obtained from the books to a rival company, and upon being discovered was discharged. The court, in refusing him judgment for his salary, characterized his act as “ moral misconduct." But authority is unnecessary to support so plain a proposition. The consideration, therefore, for the agreement in suit was illegal, and the contract declared upon never had any legal inception. Woodstock Iron Co. v Richmond &. D. Extention Co., 129 U. S. 643; Devlin v. Brady, 36 N Y 531. In the latter case the court said (page 534):
“ It is a recognized and firmly-established maxim in the law that ex turpi contractu actio non oritur, and no -person, so far back as the feudal ages, was permitted by law to stipulate for iniquity."
The contention that the agreement was relieved of the taint of illegality because Hulme, as a stockholder, was entitled to the information which was the subject of barter, is without legal support. Assuming the existence of the right, it by no means follows that Davenport was entitled to give it. He was the servant of the company, not of the stockholders. He was neither employed nor could he be discharged by them. His whole duty was to the corporation represented by the directors, who managed and controlled the-business, who alone were entitled to exercise the corporate powers,, and to whom he was solely, responsible for the proper discharge-of his functions. Such an agreement as the one in suit, though made with a stockholder, is as much within the rule of prohibition as if entered into with a stranger. Stockholders must seek the-information they are entitled to through the proper channels, and not by corrupting the employes of the company. It is idle to follow the counsel for the plaintiff in the pursuit of some theory upon which to distinguish this case and sustain a recovery. The case is too plain. The plaintiff’s assignor had no other thought than his own profit, and he drove as hard a bargain as he could in his attempt to make the most out of a shameless act. The agreement sued upon presents itself as a mere bargain for the betrayal of a trust, without qualifying circumstances, which the law repudi *189 ates, and which no court of justice will enforce. Judgment affirmed, with costs.
All concur.