COFFEY v. BURKE et al.

(Supreme Court, Appellate Division, Second Department. April 30, 1909.)

1. CONTRACTS (§ 123*)—VALIDITY—PUBLIC POLICY.
   A contract by which an employé of a city agrees for a consideration to furnish information to be used against the city in a lawsuit, such information having been acquired by him as an official of a municipality which thereafter and before his contract was merged in the city, is immoral, so that he cannot recover thereon, though the information was in the public records; it requiring some one like him, who had personal knowledge of the matter, to point it out.
   [Ed. Note.—For other cases, see Contracts, Dec. Dig. § 123.*]

2. CONTRACTS (§ 140*)—VALIDITY.
   A new promise founded on an illegal contract is tainted by the same illegality.
   [Ed. Note.—For other cases, see Contracts, Dec. Dig. § 140.*]

3. CONTRACTS (§ 138*)—ILLEGAL CONTRACTS—ENFORCEMENT.
   That defendant has the fruits of the immoral contract of plaintiff to furnish information to be used in a suit against his employer, a city, in the service of which he acquired the information, is no reason for allowing recovery of the price to be paid therefor; the law refusing its aid to maintain its own purity and for the sake of morality, not on account of defendant.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. § 138.*]

4. TRIAL (§ 177*)—DIRECTION OF VERDICT.
   There being evidence in support of defendant's counterclaim sufficient to go to the jury, and both parties moving for a direction, it could direct for defendant.
   [Ed. Note.—For other cases, see Trial, Cent. Dig. § 400; Dec. Dig. § 177.*]

Appeal from Trial Term, Kings County.

Action by Phillip J. Coffey against Mary C. Burke, executrix of Thomas P. Burke, deceased, and another. From a judgment on a verdict directed for defendants, and from an order denying a motion for new trial, plaintiff appeals. Affirmed.

Argued before HIRSCHBERG, P. J., and JENKS, GAYNOR, RICH, and MILLER, JJ.

James C. Church, for appellant.
A. L. Pincoffs (Edward D. O'Brien, on the brief), for respondents.

MILLER, J. The defendant Burke recovered $78,862.67 in a suit for legal services rendered by her testator, Thomas P. Burke, to the re-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

lators in certain mandamus proceedings. See Burke v. Baker, 111 App. Div. 422, 97 N. Y. Supp. 768; Id., 188 N. Y. 561, 80 N. E. 1033; People ex rel. Gleason v. Scannell, 172 N. Y. 316, 65 N. E. 165. This suit is brought on a contract whereby the plaintiff undertook to secure the retainers for Burke and to assist in the preparation of the cases, for which Burke was to pay him one-third of the compensation received. While Burke was doubtless forbidden to make such a contract, the · plaintiff could still recover upon it so far as the mere procuring of the retainers was concerned. Irwin v. Curie, 171 N. Y. 409, 64 N. E. 161, 58 L. R. A. 830. But the trial court held that the plaintiff's relations to the city and to the matters involved in the mandamus proceedings were such as to render the contract unenforceable.

The clients · obtained for Burke by the plaintiff had been appointed firemen by the fire commissioners of Long Island City shortly before consolidation, in apparent violation of the charter of Long Island City, from the fact that the appropriation appeared to be exhausted; wherefore they were removed. They employed counsel who instituted mandamus proceedings, evidently without knowing on what point they could win. Apparently the cases dragged along until the relators became discouraged, when they were persuaded by the plaintiff to retain Burke, who had been corporation counsel of Long Island City. The plaintiff was secretary to the mayor and clerk to the board of civil service examiners of Long Island City at the time of consolidation, when he was transferred to the position of labor clerk under the civil service commissioners of the city of New York, which position he held at the time the contract in suit was made and still holds. He knew from information gained in the position held by him prior to consolidation that the appropriation for the fire department had been exhausted by illegal payments. He testified:

"I obtained the information relative to the appropriation of $40,000 which appeared to be on the face of it to be overdrawn, but which as a matter of fact was not, from my general knowledge of Long Island City affairs by reason of being secretary to the mayor. I imparted that information to Mr. Burke in 1899, after consolidation. * * * I showed how they [referring to the items of illegal payments] should be obtained. They should consult the minutes of the board of aldermen of Long Island City at that time to see if they passed on all items of over $100 that were paid out. * * * It was through bringing out those items that the case was won."

It should be said in passing that the point now before us was not raised in Burke v. Baker, supra, and that the recovery in that case was upon a different contract. If all that is shown or suggested by this record had been established in that case, the court might have found a way to prevent a recovery, even if the point had not been raised by counsel. To say the least, the transactions involved in this suit from the beginning have an ill look; but we are dealing now only with the plaintiff's relation to them.

The plaintiff's position is that he merely undertook to render services in a matter unrelated to the duties of the position then held by him; that his information was not confidential, but was contained in public records; that he had ceased to be an employé of Long Island City; that one may use in a lawful employment knowledge gained in a former

employment; that the case is not within section 1533 of the charter (Laws 1901, p. 632, c. 466); and that the rule forbidding public officials to be personally interested in transactions with the public only applies where personal interest and public duty may conflict, citing upon the last proposition Watkins v. State, 151 Ind. 123, 49 N. E. 169, 51 N. E. 79; Edmunds v. Bullett, 59 N. J. Law, 312, 36 Atl. 774. The principle of those cases is not involved here. No doubt the plaintiff could have entered into a contract with the city provided it was lawful and wholly unrelated to any duty which he might have to discharge. The question here is whether a particular contract is lawful. It is true that public records supplied the proof upon which the firemen's cases were won, but those records might as well have been sealed books so far as any one not familiar with the facts was concerned. No one seems to have known of the point until the plaintiff got in the case, and any one not familiar, as the plaintiff was, with the methods practiced in Long Island City of evading or disregarding the law, might have searched in vain to discover the point. The record was there, but the plaintiff had the key. Moreover, the plaintiff's employment was not terminated upon consolidation. As to him the city of New York became the successor to Long Island City. His position was abolished, but he was transferred to another like it. The change was only nominal. And it is not strictly true that the firemen's cases were wholly unrelated to the duties of the plaintiff's new position, for the evidence is that on the trial of those cases he was deputed by the civil service commission to take certain books to court which the commission was subpœnaed to produce. Presumably the plaintiff's duties had some relation to those records, and it does not require evidence to show that the removal or reinstatement of employés of the city more or less remotely affects the work and the duties of the civil service commission. However, the plaintiff testified that in the new position he had to do only with common laborers, and we will assume for the purposes of the discussion that the new position had no relation to the old, and that its duties had no relation to the matters involved in the firemen's cases. The plaintiff still remained in the employ of the city in which his former employer was merged, and, however clever the attempt to disguise the nature of the contract sued on and to make it appear to be an ordinary contract to perform services, the upshot of it is that while still in the employ of the city the plaintiff merchandised knowledge acquired as an official of the city to be used in a lawsuit against the city, and is now suing for the price. That that was an unconscionable and immoral thing to do does not seem to me open to argument; and I go so far as to say that that would be so even if the plaintiff had left the employ of the city. To be sure, of necessity one in a given employment must be permitted to utilize knowledge gained in a former employment. When the relation of employer and employé ceases, the employé is not required to put out of his mind everything pertaining to his former employer's business, but there are or should be moral restraints at least upon the uses to which he can put that knowledge. Manifestly knowledge gained in a given employment belongs to the employer so long as the relation continues in the sense that it is to be used for his benefit, not to his injury. And certainly an em-

ployer never expects, when he trusts his employé with knowledge of his affairs, that that knowledge will be used, even after the termination of the employment, solely to injure him. I assume it could be used in a rival business, for example, if there were no stipulation to the contrary, with some consequential injury to him. But selling it to an adversary for use in a lawsuit is a very different thing, and one which seems to me to violate an implied obligation which the employé assumes upon entering the service of the employer. Morally I see little distinction between compelling the former employer to purchase silence and selling the information to his adversary. One is criminal; both are immoral, and the law will not aid one to recover the price of his immorality.

The plaintiff, however, is in a worse case. He still owed the duties of an employé to the city. An employé, though not in a position of trust or confidence as those terms are generally employed, owes a duty of loyalty to the employer beyond that merely of doing the work which he is employed to do. The relation itself involves an element of confidence. No one would keep in his employ, no matter how simple the duties of the position, one hostile to his interests, or who would sell information to an adversary in a lawsuit. Can there be any doubt that a discharge for such a reason would be justifiable? While an employé of the city may not be precluded from contracting with the city, I think he is precluded from selling information, no matter how gained, to be used against the city in legal proceedings. One so regardless of his employer's interests has no business to be in the service of another. If, instead of seeking to recover the price of his immoral bargain, the plaintiff were here defending removal proceedings, assuming he held a position from which he could only be removed upon charges after trial, would we say that the grounds were not sufficient, that the city was bound to keep in its service men who were merchandising information for use in litigations against it? The respondents cite two cases which, though in some respects distinguishable, are near enough like this to support the judgment appealed from in the absence of any other authority: Lucas v. Allen, 80 Ky. 681, and Davenport v. Hulme, 11 Misc. Rep. 521, 32 N. Y. Supp. 803.

There may be considerations of public policy applicable to public servants which do not apply to the ordinary relation of employer and employé, but considered solely from the latter standpoint the contract sued on seems to me so plainly against good morals and decent, honorable conduct as to require that the law should not aid its enforcement. The plaintiff, however, contends that the rule cannot be invoked in this case, for the reason that the money is in the hands of a third party. It appeared that it was received by the attorney of the plaintiff in the case of Burke v. Baker, supra, the defendant in this case. His possession of the money was that of his client, notwithstanding she was required to give security to get it.

It is also contended that the evidence tended to show a new agreement, or at least a settlement of the partnership accounts after the consummation of the illegal transaction. The plaintiff did not plead any such new or independent contract. Moreover, it is now settled that a

new promise not collateral to and independent of, but wholly founded upon, the illegal contract, is tainted by the same illegality. McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117. And see Gray v. Hook, 4 N. Y. 449. It may be that the defendant has the fruits of the illegal contract, but the law refuses its aid to maintain its own purity and for the sake of morality, not on account of the defendant. Knowlton v. Congress & Empire Spring Co., 57 N. Y. 518; Embrey v. Jemison, 131 U. S. 336, 9 Sup. Ct. 776, 33 L. Ed. 172; Coppell v. Hall, 7 Wall. 542, 19 L. Ed. 244; Oscanyan v. Arms Co., 103 U. S. 261, 26 L. Ed. 539.

Complaint is also made because of the direction of a verdict in favor of the defendant on the counterclaim, on the ground that there was no evidence to justify it; but that position is untenable. One of the plaintiff's exhibits contains an account kept by Burke, showing an indebtedness which, with interest, amounted to as much as, or more than, the sum for which the verdict was directed. That evidence was in the case for whatever it was worth, and, as both sides moved, the question was for the court.

The judgment is affirmed.

Judgment and order affirmed, with costs. All concur.

---

### PAULDING v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Second Department. April 30, 1909.)

1. RAILROADS (§ 274*)—INJURIES TO PERSONS AT STATIONS—CARE REQUIRED.

A railroad company, permitting the use of its station as a post office, is bound to exercise reasonable care to protect persons so using the premises from injury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 868–872; Dec. Dig. § 274.*]

2. RAILROADS (§ 282*) — INJURIES TO PERSONS AT STATION — ACTIONS FOR INJURIES—QUESTIONS FOR JURY—NEGLIGENCE.

Whether the running of a train at the rate of 35 miles an hour past a station used as a post office, without warning of its approach, the track being curved and the clear space of the platform less than 5 feet, was negligence, *held*, in an action for the death of a person who was struck, for the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 917; Dec. Dig. § 282.*]

3. RAILROADS (§ 278*) — INJURIES TO PERSONS AT STATIONS — CONTRIBUTORY NEGLIGENCE.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 891–900; Dec. Dig. § 278.*]

Appeal from Trial Term, Westchester County.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes