Harold Baer, J.
Defendants move for summary judgment, pursuant to CPLR 3212, to dismiss the complaint. Plaintiff cross-moves for summary judgment and attacks the validity and enforceability of the recent Moratorium Act (L 1975, ch 874) enacted " to ameliorate the disastrous consequences, to taxpayers, to .holders of short term obligations and to city residents, of an inability by the city to meet its financial and governmental responsibilities in full * * * and * * * to avoid undue disruption of the process of financial recovery already under way, so as to facilitate restoration of the city’s financial integrity and the payment of all its obligations.”
The complaint alleges (1) that the Moratorium Act impairs contracts between the city and its noteholders, thus violating section 10 of article I of the United States Constitution; (2) violates article VIII of the State Constitution by refusal to adhere to the restrictions therein on borrowing and securing the city notes; (3) violates the same article VIII of the State Constitution with respect to the limited time for redemption of city notes; (4) alleges that the Moratorium Act is in conflict *978 with subdivision (i) of section 83 of the Federal Bankruptcy Law (US Code, tit 11, § 403, subd [i]) in that the Moratorium Act binds nonconsenting creditors to a composition plan; (5) violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution as it applies to city notes and not city bonds. A sixth cause of action seeks injunctive relief against the Municipal Assistance Corporation (MAC) mandating an extension of time for the exchange of notes for MAC bonds until after the constitutionality of the Moratorium Act has been determined.
We must deal with this subject realistically in light of the financial crisis in the city. In June of 1975, the Legislature in an effort to aid the city enacted the Municipal Assistance Corporation for the City of New York (MAC) (L 1975, ch 169; Public Authorities Law, § 3033, subd 1). MAC was empowered to issue and sell bonds and notes to aid the city financially (Public Authorities Law, §§ 3035, 3037). This did not solve the drastic financial situation within the city and in September, 1975, the New York State Financial Emergency Act for the City of New York was enacted (L 1975, chs 868, 869, 870). Basically, this board is to supervise and control city finances so that the city may balance its budget over a three-year period. The stated purpose is to aid the city to maintain essential services and meet its obligations to holders of outstanding securities (L 1975, ch 868, § 1).
The problems of the city continued, indeed they worsened, and the Legislature found a "grave public emergency”. It was under this emergency situation that the Legislature enacted the Moratorium Act on November 15, 1975 (L 1975, ch 874). The act imposes a three-year moratorium on the enforcement of outstanding city notes "to avoid destructive actions during the time the city requires to regain its financial health” (L 1975, ch 874 .§ 1). The period of the moratorium is three years from the effective date of the act, and the notes involved are "short term obligations”, tax anticipation notes, bond anticipation notes, revenue anticipation notes, budget notes and urban renewal notes issued by the city. The principal amount of these obligations outstanding is approximately $4.7 billion.
Holders of notes have the opportunity of voluntarily exchanging them for MAC bonds in the same principal amount with at least 6% interest and with maturity not exceeding 20 years. Those holders who decline to make the exchange will receive interest as stated in the notes until maturity, and 6% *979 thereafter (L 1975, ch 874, §2; New York State Emergency Moratorium Act, § 5, as amd by L 1975, ch 875, § 1).
On November 26, 1975, MAC offered to exchange its 8% bonds due July 1, 1986 for approximately $1.6 billion of city notes. The expiration date of the exchange offer, originally December 10, 1975 has been extended to December 29, 1975.
So much for background; we now must review the law with respect to the plaintiffs contentions.
(1) Does the Moratorium Act violate section 10 of article I of the United States Constitution by impairing contracts between the city and its note holders? I do not believe there is a violation of the Constitution. The courts, Federal and State, have given priority to the public interest over strict compliance with the contract clause.
Numerous decisions of these highest Federal and State courts long ago repudiated the notion which plaintiff here espouses that the contract clause presents a rigid bar to the protection of vital public interests, recognizing instead the power, and indeed, the duty of States to prevent the literal enforcement of contractual terms in order to protect the health, safety or welfare of their citizens. (See, Home Bldg. & L. Assn. v Blaisdell, 290 US 398; East New York Bank v Hahn, 326 US 230, affg 293 NY 622; Faitoute Co. v Asbury Park, 316 US 502; El Paso v Simmons, 379 US 497; Klinke v Samuels, 264 NY 144; Matter of People (Title & Mtge. Guar. Co.), 264 NY 69; Maguire & Co. v Lent & Lent, 277 NY 694.)
Home Bldg. & L. Assn. v Blaisdell (supra) involved the Minnesota Mortgage Moratorium Law enacted in response to an "economic emergency” caused by the depression of the 1930’s. The respective importance of a State’s police power and the contract clause of the Constitution is set forth in the United States Supreme Court decision (pp 426, 434-435, 437):
"While emergency does not create power, emergency may furnish the occasion for the exercise of power * * *
"Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect’ * * * Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of *980 essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while, — a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court * * *
"[ejconomic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts”.
The sole question for judicial determination (p 438) "is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end.”
The State of New York also enacted a moratorium law suspending the right of a mortgagee to seek to enforce his mortgage by foreclosure or suit for nonpayment of principal in 1933. (L 1933, ch 793.) This moratorium law was extended, year by year, to last for over a decade. The New York Court of Appeals sustained the original enactment of the moratorium law against constitutional challenge in Klinke v Samuels (264 NY 144, supra) and subsequently sustained its extension in East New York Bank v Hahn (293 NY 622, supra).
In 1945 the Hahn case reached the United States Supreme Court (326 US 230), and the challenge to the New York mortgage moratorium then in effect for 12 years was rejected summarily and without dissent. As the Supreme Court stated (pp 232-233):
"The Blaisdell case and decisions rendered since [citations omitted] yield this governing constitutional principle: when a widely diffused public interest has become enmeshed in a network of multitudinous private arrangements, the authority of the State 'to safeguard the vital interests of its people,’ * * * is not to be gainsaid by abstracting one such arrangement from its public context and treating it as though it were an isolated private contract constitutionally immune from impairment.
"The formal mode of reasoning by means of which 'protective power of the State’ * * * is acknowledged is of little moment. It may be treated as an implied condition of every *981 contract and, as such, as much part of the contract as though it were written into it, whereby the State’s exercise of its power enforces, and does not impair, a contract. A more candid statement is to recognize * * * that the power 'which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the * * * general welfare of the people, and is paramount to any rights under contracts between individuals.’ * * * [Citations omitted.] Once we are in this domain of the reserve power of a State we must respect the 'wide discretion on the part of the legislature in determining what is and what is not necessary.’ Ibid. So far as the constitutional issue is concerned, 'the power of the State when otherwise justified’ * * * [citations omitted] is not diminished because a private contract may be affected.”
While the Hahn case dealt with individuals there is no doubt that the same principles apply to the power of the Legislature over contracts made by the subdivisions of the State. In another case, the Supreme Court said: "If a State retains police power [to alter contracts] with respect to building and loan associations * * * [citations omitted] because of their relation to the financial well-being of the State, and if it may authorize the reorganization of an insolvent bank upon the approval of a state superintendent of banks and a court, but over the dissent of one fourth of the depositors (except preferred or secured claimants) * * * [citation omitted], a State should certainly not be denied a like power for the maintenance of its political subdivisions and for the protection not only of their credit but of all the creditors”. (Faitoute Co. v Asbury Park, 316 US 502, 513-514, supra.)
In this later case, municipal obligations of the City of Asbury Park were involved and the Supreme Court upheld the constitutionality of a New Jersey statute enacted to meet a "public emergency” arising from a default on municipal obligations. Plaintiff insists that the cases hereinabove cited are not applicable because of variance in facts and State statutes. In none of the cases are the facts exactly the same but the language of the highest courts in deciding the cases clearly evokes the principles relied upon. For the reasons cited, the answer to plaintiff’s first cause of action is that the Moratorium Act does not violate section 10 of article I of the United States Constitution by impairing contracts between the city and its noteholders.
*982 (2) Does the Moratorium Act violate sections 2, 10 and 12 of article VIII of the New York State Constitution by refusing to adhere to the restrictions therein on borrowing and securing city notes? Plaintiffs theory is that the city has the power and obligation to raise by taxes any amount required to pay outstanding notes. That the city has pledged its "faith and credit” and must provide by real estate taxes for the payment of interest and principal on indebtedness.
Aside from the fact that short term municipal obligations are not covered by section 2 of article VIII of the State Constitution (see par 3, infra), the Moratorium Act does not abrogate the liability of the city. The purpose of the act is to provide the means for ultimate payment of interest and the full principal. The city is not relieved from its pledge of "faith and credit”. It is obligated to collect and allocate revenues within constitutional priorities. Its authority is not restricted in relation to its right and duty to levy and collect taxes. Of course, we must recognize the realistic limitations on the taxing power of the city. A point is reached where increased taxes bring in less revenues and economic erosion results (see Faitoute Co. v Asbury Park, supra, p 509). The Legislature recognized this economic principle. Although some additional taxes were enacted, it passed the Moratorium Act at a time of emergency to give the city time to put its financial house in order so that it could fully meet its obligations (Faitoute, supra, pp 509-511). There is no violation of sections 2, 10 and 12 of article VIII of the Constitution of the State of New York.
(3) The third cause of action raises another question with respect to section 2 of article VIII of the State Constitution. Does that section require the city to redeem its notes "no later than the second fiscal year immediately succeeding the fiscal year in which such indebtedness was contracted”?
This clause does not apply to city short term notes. Assuming that it does apply, the cases cited above and the Moratorium Act would be sufficient to extend the maturity date of the indebtedness. There is no violation of the State Constitution.
(4) Does the Moratorium Act violate subdivision (i) of section 83 of the Federal Bankruptcy Act (US Code, tit 11, § 403, subd [i])? That act does provide that no State law "prescribing a method of composition of indebtedness of [municipalities] * * * shall be binding upon any creditor who does not consent to such composition”.
*983 Nothing in the Moratorium Act empowers the city to discharge, cancel or force surrender of the notes. It permits an extension of indebtedness. The city obtains time to pay in full.
In Perry v Commerce Loan Co. (383 US 392, 398-399), the Supreme Court observed that "Extension plans * * * differ materially from * * * plans by way of composition, all of which contemplate only a partial payment of the * * * debts. Indeed, under an extension plan, the [petitioner] who makes the required payments will have paid his debts in full”. (Emphasis supplied.)
(See US v Bekins, 304 US 27, 50; Bankruptcy Act, § 606, subds [6], [7]; US Code, tit 11, § 1006, subds [6], [7].)
I find no conflict with the Bankruptcy Act.
(5) The fifth cause of action contends that the Moratorium Act violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because it "applies to City notes” and "does not apply to City bonds”.
There are many differences between notes and bonds. Article VIII of the State Constitution is replete with differences in the rights of and obligations to bondholders and noteholders. The city has a problem in meeting its short term (note) obligations of over $3 billion, while it is capable of meeting its long term indebtedness. Therefore, the Legislature imposed a moratorium on the notes and not on the bonds. This can hardly be considered a constitutional violation of equal rights. This is not a new thought. In the case of Home Bldg. & L. Assn. v Blaisdell (supra, p 448) the court treated with a similar argument "Nor do we think that the statute denies to the appellant the equal protection of the laws. The classification which the statute makes cannot be said to be an arbitrary one.” (Citations omitted.)
Both noteholders and bondholders are treated equally. Both have the right to be paid and provision is made to pay them in full.
We need not discuss the plaintiff’s sixth cause of action or its motion for a mandatory injunction (CPLR 6301). Although this court acknowledged that it was without jurisdiction to issue a preliminary and mandatory injunction (Bachman v Harrington, 184 NY 458), defendants agreed that the offer to exchange notes for MAC bonds would be extended to five days after entry of the judgment herein.
In addition to the legal precepts urged by plaintiff and *984 defendants, we must turn to the equitable phase of this controversy. Plaintiff was asked to explain the benefits to be derived by it and other similarly situated noteholders if successful in declaring the Note Moratorium Act unconstitutional. The answer was that it would uphold the Constitution; that the small investor, the small bank and the many individual noteholders had no other protection or recourse. That the act was a means of protecting the large banks but if pressed, increased real estate taxes and ingenuity would find a way for the city to pay the short term obligations. That declaring the act unconstitutional was the only means of protecting the plaintiff and others with similar status from impairment of the city’s contractual obligations.
This is an equity proceeding. Equity under the law is defined as the application of the dictates of conscience or the principles of natural justice to the settlement of controversies. It is a system of jurisprudence, a body of rules and doctrines serving to supplement and remedy the limitations and inflexibility of the common law. In weighing the equities in this case, we must assess, as against plaintiff’s questionable gains from a declaration of unconstitutionality, the result, not only to the defendants, but to the public at large. The plaintiff may gain a Pyrrhic victory but the public would face the unpredictable but costly results of default. Bankruptcy for the City of New York is not only financial disaster for the city but the noteholders, including this plaintiff, would lose interest on their investment and a substantial portion of the principal as well. The many services that a municipality must provide would be so depleted as to cause danger to health, safety and the welfare of the public. The cost of strict adherence to the legalistic concept urged by plaintiff is by far outweighed by the equities in favor of the defendants. While there is no certainty that the notes of the city will be paid in three years or that MAC bonds will be paid by or before 1986, there is the distinct hope and possibility that the moratorium will aid the city to budget balancing and financial responsibility during the three years of grace allotted to it.
The only noteholders that may be hurt financially are the small individual investors. They may need the principal now. I would urge — but I do not mandate — that provision be made to pay principal as the notes mature to those individuals who have invested $10,000 or under and who can show need for payment of their notes as they become due.
*985 I began by urging a realistic view of this controversy. I meant no more than to urge an equitable view that would do justice to the greatest number.
For all these reasons, summary judgment is granted to the defendants and the complaint is dismissed.