ROPICO, INC., Plaintiff,

v.

The CITY OF NEW YORK et
al., Defendants,

and

Louis J. Lefkowitz, Attorney General of
the State of New York,
Intervenor-Defendant.

Alfred AVINS, Plaintiff,

v.

The CITY OF NEW YORK and Harrison
J. Goldin, Defendants,

and

Louis J. Lefkowitz, Attorney General of
the State of New York,
Intervenor-Defendant.

Nos. 75 Civ. 6168, 75 Civ. 6246.

United States District Court,
S. D. New York.

Sept. 7, 1976.

Alfred Avins, pro se.

W. Bernard Richland, Corp. Counsel, New York City, attorney for defendants City of New York and Goldin; James G. Greilsheimer, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, for intervenor-defendant; Shirley A. Siegel, New York City, of counsel.

Malcolm A. MacIntyre, Godfrey P. Schmidt, New York City, for Ropico, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Municipal Assistance Corp. for the City of New York; Robert L. Laufer, Howard S. Veisz, New York City, of counsel.

GAGLIARDI, District Judge.

These two actions challenge the validity under federal law of the New York State Emergency Moratorium Act for the City of New York, 1975 McKinney Session Laws (Extraordinary Session), Chapters 874, 875 (the "Moratorium Act"). Parties in both actions have cross-moved for summary

judgment. For the reasons stated below, defendants' motions to dismiss the complaint are granted.

The Moratorium Act was enacted on November 14, 1975 at an Extraordinary Session of the New York State legislature as part of a plan to avert the impending default by the City of New York on full faith and credit obligations falling due in December of 1975. The Moratorium Act provides in essence that payment of principal on short-term notes of the City otherwise due in 1975 and 1976 shall be suspended for three years, but that noteholders have the right either (1) to exchange their notes for longer term obligations of the Municipal Assistance Corporation ("MAC") bearing an interest rate of at least six percent per year or (2) to obtain six percent interest per year, plus any additional amount that may be held mandated under the federal or state constitutions on their existing obligations until the principal is repaid.

Plaintiffs are holders of New York City Revenue Anticipation notes by their original terms due and payable on December 11, 1975. Their complaints allege that the Moratorium Act is invalid under federal law because (1) it impairs the obligation of contracts in violation of Article I, Section 10 of the United States Constitution, (2) it deprives the noteholders of their property without due process in violation of the Fourteenth Amendment, (3) it denies the noteholders access to the courts to enforce claims for payment on the notes, and (4) it violates Section 83(i) of the Bankruptcy Act, 11 U.S.C. § 403(i), (now Section 83 of the Act, 11 U.S.C. § 403, P.L. 94–260 (April 8, 1976) and Article I, Section 8, Clause 4 of the Constitution by prescribing a state method of composition of indebtedness. The amended complaint of Ropico, Inc., plaintiff in 75 Civ. 6168, also claims that the Moratorium Act violates the Equal Protection Clause of the Fourteenth Amendment by arbitrarily modifying the rights of short-term City noteholders, while leaving unaffected the rights of bondholders and other City creditors, and that it violates Article IV, Section 1, Clause 1 of the Constitution, which requires that a state give full faith and credit to the "public acts" of every other state. The cases were argued together before this court and are hereby consolidated for decision pursuant to Rule 42(a), Fed.R.Civ.P.

Shortly after these actions were filed the defendants in both cases moved for a stay of further proceedings pending resolution of a state court action raising essentially these same federal claims and additional claims based on the New York State Constitution. *Flushing National Bank v. Municipal Assistance Corporation for City of New York*, 84 Misc.2d 976, 379 N.Y.S.2d 978 (Sup. Ct.N.Y.Co.1975), *aff'd*, 52 A.D.2d 84, 382 N.Y.S.2d 764 (1st Dep't 1976) (the "*Flushing Bank* case"). In that case State Supreme Court Justice Harold Baer held that the Moratorium Act does not violate any provision of federal law or the New York State Constitution. His decision was unanimously affirmed by the Appellate Division on May 4, 1976, and is now on appeal to the New York Court of Appeals with argument scheduled for September 7, 1976.

In a memorandum decision dated May 17, 1976, this court denied defendants' motion for a stay on the ground that the state law claims in the *Flushing Bank* case were not susceptible to an interpretation that would render a federal adjudication of the claims here unnecessary, and ruled that since the Moratorium Act is not a statute of statewide application, it is not properly a matter for a three-judge court. *Ropico, Inc. v. City of New York et al.*, 415 F.Supp. 577 (S.D.N.Y.1976). The parties then cross-moved for summary judgment, and the New York State Attorney General formally intervened as a party defendant.[1] At the oral argument on the summary judgment motions, this court on the record denied plaintiffs'

1. Ropico named as defendants the City of New York, Harrison J. Goldin, the City Comptroller, and MAC. Avins named only Goldin and the City, but MAC has been permitted by this court to participate as *amicus curiae.*

motions for class action certification[2] on the ground that a class action in these cases is unnecessary as a judgment favorable to the plaintiffs will affect the rights of all holders of City notes and thus inure to the benefit of all others similarly situated. *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974); *McDonald v. McLucas*, 371 F.Supp. 831, 833–34 (S.D.N.Y.1974), *aff'd without opinion*, 419 U.S. 987, 95 S.Ct. 297, 42 L.Ed.2d 261 (1974); *Tyson v. New York City Housing Authority*, 369 F.Supp. 513, 516 (S.D.N.Y. 1974).

*I. The Facts*

The basic facts are not in dispute. The following facts, set forth in defendants' uncontested statement submitted pursuant to Rule 9(g) of the local rules of this court and other uncontested affidavits submitted by the defendants, are essential to an understanding of the legal issues involved in these lawsuits.

In March and April of 1975 the City of New York was unable to sell its securities in the public markets and thus could not refinance its large short-term debt. As a result the City faced the distinct possibility that it would have to default on its obligations.

During the last few months of the fiscal year ending June 30, 1975, the State advanced $800 million to the City. This advance consisted of funds which would not otherwise have been paid the City until the fiscal year ending June 30, 1976. In June of 1975, with the City still unable to sell its notes in the public markets, the state legislature enacted the New York State Municipal Assistance Corporation Act, Public Authorities Law § 3001 *et seq.* (McKinney's 1975 Supp.). That Act created MAC, a "corporate governmental agency and in-

strumentality of the state constituting a public benefit corporation." Public Authority Law § 3033(1).

MAC is empowered to issue its own bonds to raise money for the City's benefit. Public Authorities Law § 3012(1)(a). Unlike City obligations, which are secured by the full faith and credit of the City or any other governmental entity with taxing authority, the MAC bonds are secured by revenues from the New York State stock transfer tax, the City sales tax, and certain state aid allocations to the City.

The Legislature originally empowered MAC to sell an initial issue of $3 billion for the City through bond sales to the general investing public. MAC sold $1 billion of its bonds in early July of 1975, but subsequent efforts to sell an additional $1 billion in August faltered. On September 9, 1975 the New York State Legislature convened in Extraordinary Session and passed the New York State Financial Emergency Act for the City of New York (the "Financial Emergency Act"), 1975 McKinney Session Laws (Extraordinary Session) Chapters 868, 869, 870.

The Financial Emergency Act provides for (1) the creation of a state controlled Emergency Financial Control Board to review and supervise the management of the City and to formulate in conjunction with City officials a three-year financial plan to restore the City to a sound fiscal condition, Financial Emergency Act §§ 5–8, (2) a wage freeze on salary increases for all city employees who had not previously agreed to such a freeze voluntarily, Financial Emergency Act § 10, and (3) a purchase of $750 million of MAC bonds by the State. The Financial Emergency Act further contains provisions authorizing and directing the trustees of various city and state retirement funds and the State Insurance Fund to purchase MAC obligations.

---

**2.** Both plaintiffs sought to represent only those noteholders who have not exchanged their notes for MAC bonds pursuant to the Exchange Offer. To the degree that footnote 4 of this court's previous decision in this action indicates that Ropico sought representation of all

noteholders it is in error, and is hereby amended to reflect this change. As a result, these suits affect the holders of approximately $1.1 billion in principal of city notes not $1.6 billion as indicated in the previous decision.

The preamble to the Financial Emergency Act sets forth extensive findings of fact concerning the financial problems facing New York City including the following:

It is hereby found and declared that a financial emergency and an emergency period exists in the city of New York. The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders of outstanding securities. Unless such funds are obtained the city will soon (i) fail to pay salaries and wages to employees and amounts owed vendors and suppliers to the city, (ii) fail to pay amounts due to persons receiving assistance from the city and (iii) default on the interest and principal payments due the holders of outstanding obligations of the city.

If such failures and defaults were to occur, the effect on the city and its inhabitants would be devastating: (1) unpaid employees might refuse to work; (2) unpaid vendors and suppliers might refuse to sell their goods and render services to the city; (3) unpaid recipients of public assistance would be unable to provide themselves with the basic necessities of life; and (4) unpaid holders of city obligations would seek judicial enforcement of their legal rights as to city revenues. These events would effectively force the city to stop operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants.

The difficulties of finding solutions to such events would be compounded by the likelihood that the city, as well as the municipal assistance corporation for the city of New York, would be foreclosed from seeking funds in the public markets. The elimination of the public markets as a source of funds would leave the city with no foreseeable way to refund its outstanding short-term indebtedness. Thus, the city might be unable for an extended period to cure defaults on its outstanding obligations and that event could almost permanently destroy the fiber of the city.

\* \* \* \* \* \*

This situation is a disaster and creates a state of emergency. To end this disaster, to bring the emergency under control and to respond to the overriding state concern described above, the state must undertake an extraordinary exercise of its police and emergency powers under the state constitution, and exercise controls and supervision over the financial affairs of the city of New York, but in a manner intended to preserve the ability of city officials to determine programs and expenditure priorities within available financial resources.

To forestall the effects on the city and the state of a failure by the city to meet its obligations when due, the state has developed, in coordination with the municipal assistance corporation for the city of New York and certain private financial institutions located in the city, a financial program designed to infuse the city with funds needed by it during the next several months. This financial program is only a short-term means of helping the city to meet its obligations during this emergency period. For longer range success, the city must restore investor receptivity to the obligations of the city.

Thus, faced with the possibility of an imminent default on the City's obligations, the state legislature on November 14, 1975 enacted the Moratorium Act, which states in its preamble:

It is hereby found and declared that the grave public emergency found and declared to exist by the legislature in adopting the New York State Financial Emergency Act for the City of New York has dramatically worsened in the last two months. Today, not only is the City of New York threatened with default on its outstanding obligations, but financially sound agencies of the state itself are similarly threatened because of public fears about the effects of default by the city. In the absence of the passage of the Moratorium Act approximately $3.149 billion in

principal and interest would have been due short-term City noteholders other than MAC within the next year. Of this amount, $1.7 billion[3] was held by private individuals or corporations other than New York's eleven major clearing house banks, and certain city pension funds (the "Institutional Holders"). These Institutional Holders agreed, subject to the passage of federal legislation providing for a loan to the city in excess of $2.3 billion,[4] that their $849 million of city notes would be subject to the moratorium, and that after the expiration of the three-year moratorium these notes would continue to bear an interest rate of six percent per annum and would not be fully paid off until July 1, 1986. In addition, the Institutional Holders agreed to adjust the terms of the approximately $1.7 billion of city bonds which they held and the trustees of various city pension funds agreed to purchase $2.53 billion of newly issued obligations of the city and MAC.

On November 26, 1975, pursuant to the provisions of the Moratorium Act, MAC made an exchange offer granting the private noteholders the right to exchange their notes for MAC bonds maturing on July 1, 1986 with an annual interest rate of 8% a year. The MAC bonds available to the noteholders in the exchange offer also were subordinate to the approximately $3 billion of bonds previously issued by MAC. Noteholders who accepted the exchange offer were required to sign a statement waiving their rights under suits like this one challenging the validity of the Moratorium Act. Noteholders who did not accept this exchange offer were to receive full payment of interest at the stated rate until the original maturity date, and six percent per year thereafter. Non-accepting noteholders were precluded from bringing suit to obtain their principal until the expiration of the Act on November 15, 1978.

By December 29, 1975, the expiration date of the original exchange offer, approximately 30% of the noteholders had elected to convert their notes to MAC bonds.

## II. Constitutional Claims

A key element in this court's upholding of the constitutionality of the Moratorium Act is its recognition of the emergency situation facing the City of New York. In so recognizing, the court is guided by the Supreme Court's review of similar state legislative and judicial findings of the existence of a fiscal emergency in *Home Building and Loan Ass'n. v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). As in *Blaisdell,* this court finds that the declarations of the existence of this emergency by the New York State courts in the *Flushing Bank* case and by the state legislature in the Financial Emergency Act, *supra* at pp. 973–975, ". . . cannot be regarded as a subterfuge or as lacking in adequate basis." 290 U.S. at 444, 54 S.Ct. at 242. The finding of the legislature and state courts has support in the facts as outlined above, pp. 973–975. *Id.*

### A. Contract Clause

Plaintiffs contend that the Moratorium Act violates Article I, Section 10, Clause 1 of the United States Constitution, which provides in pertinent part: "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." This court concludes that the Moratorium Act does not violate this clause of the Constitution.

In *Home Building & Loan Association v. Blaisdell, supra,* the Supreme Court comprehensively reviewed the precedents relating to the Contract Clause and upheld the validity of a mortgage moratorium act passed

---

**3.** The interest rates on these short-term notes are 9.50% for the $339.5 million in principal due December 11, 1975; 9.40% for the $596.7 million in principal due January 12, 1976; 7.55% for the $281.5 million in principal due February 13, 1976; and 8.75% for the $382.5 million in principal due March 12, 1976. Official Statement of Municipal Assistance Corporation for the City of New York, Exchange Offer, p. 3 (Nov. 26, 1975).

**4.** A bill providing for $2.3 billion of seasonal loans to New York City was enacted on December 9, 1975. New York City Seasonal Financing Act of 1975, 31 U.S.C. § 1501 *et seq.*

by the Minnesota legislature as an emergency measure to deal with the problem of foreclosures during the Depression. In that case, Chief Justice Hughes stated:

Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect." *Stephenson v. Binford,* 287 U.S. 251, 276, 53 S.Ct. 181, 189, 77 L.Ed. 288. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court. 290 U.S. at 434–35, 54 S.Ct. at 239 (footnote omitted).

In *Faitoute Iron & Steel Co. v. City of Asbury Park,* 316 U.S. 502, 62 S.Ct. 1129, 86 L.Ed. 1629 (1942), plaintiffs contested the adjustment of debt issued by the City of Asbury Park, New Jersey, pursuant to a state insolvency law. Applying the analysis of *Blaisdell,* the Court held that a plan requiring the holders of the municipal debt to exchange their bonds for new bonds with a later maturity date and a lower interest rate did not violate the Contract Clause. Justice Frankfurter noted that in such cases:

Impairment of an obligation means refusal to pay an honest debt; it does not mean contriving ways and means for paying it. The necessity compelled by unexpected financial conditions to modify an original arrangement for discharging a city's debt is implied in every such obligation for the very reason that thereby the obligation is discharged, not impaired

.   .   .

\*       \*       \*       \*       \*       \*

If a State retains police power with respect to building and loan associations, *Veix v. Sixth Ward Assn.,* 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061 [1940], because of their relation to the financial wellbeing of the state, and if it may authorize the reorganization of an insolvent bank upon the approval of a state superintendent of banks and a court but over the dissent of one-fourth of the depositors (except preferred or secured claimants), *Doty v. Love,* 295 U.S. 64, 55 S.Ct. 558, 79 L.Ed. 1303 [1935], a state should certainly not be denied a like power for the maintenance of its political subdivisions and for the protection not only of their credit but of all the creditors by an adjustment assented to by at least 85 percent of the creditors, approved by the commission of the state having oversight of its municipalities, and found wise and just after due hearing by a court. 316 U.S. at 511, 513–514, 62 S.Ct. at 1134.

This holding has been reaffirmed in several more recent cases involving attacks on modifications of obligations of state governments. *City of El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965); *United States Trust Co. of New York v. State of New Jersey,* 134 N.J.Super. 124, 338 A.2d 833 (Sup.Ct.1975), *aff'd on the opinion below,* 69 N.J. 253, 353 A.2d 514, *prob. juris. noted* 427 U.S. 903, 96 S.Ct. 3188, 49 L.Ed.2d 1197 (1976); *see also East New York Savings Bank v. Hahn,* 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34 (1945).

To be contrasted with *Blaisdell, Faitoute* and other similar cases is *W. B. Worthen Co. v. Kavanaugh,* 295 U.S. 56, 55 S.Ct. 555, 79 L.Ed. 1298 (1935), where it was held that an Arkansas mortgage moratorium law which effectively provided for no payment of interest or principal to mortgageholders for six years was a violation of the contract clause. The Court in *Kavanaugh* reasoned that the *Blaisdell* case was not controlling because the Arkansas statute "with studied

indifference to the interests of the mortgagee . . . [had] taken from the mortgagee the quality of an acceptable investment for a rational investor." 295 U.S. at 60, 55 S.Ct. at 557.

The Moratorium Act provides an option to exchange the notes for MAC obligations or for six percent interest on obligations not exchanged. Furthermore, as has been indicated above, the adjustments that the noteholders are obliged to make appear commensurate with the adjustments made by many others affected by the City's financial crisis. The Moratorium Act's limited adjustment of the noteholders' rights in response to the emergency situation facing the city is substantially different from the almost total disregard of the rights of the mortgage holders in *Kavanaugh.* Under these circumstances, the *Blaisdell* and *Faitoute* cases are directly controlling and, accordingly, this court finds that the Moratorium Act does not violate Article I, Section 10, Clause 1 of the Constitution.

### B. *Due Process*

Plaintiffs assert that the Moratorium Act violates the Fourteenth Amendment by depriving them of property without due process of law. This court concludes that there is no Due Process violation under the circumstances here.

In order to fulfill its primary obligation to protect the well-being of its citizens in times of emergency, a sovereign may take action which constitutes some taking of property without being required to pay compensation. *United States v. Caltex, Inc.,* 344 U.S. 149, 155, 73 S.Ct. 200, 97 L.Ed. 157 (1952). Here the State of New York has enacted legislation which it deemed essential to the financial survival of its largest city. The Moratorium Act suspends for a limited period the rights of certain of its creditors to sue in the state courts to obtain immediate full payment on their notes. Even if this legislation provides for a taking of some contractual rights of the plaintiffs, given the pressing public emergency which the legislature found, such a limited taking of plaintiffs'

rights without compensation or judicial review is a permissible exercise of the state's police power. *City of El Paso v. Simmons, supra,* 379 U.S. at 506–08, 85 S.Ct. 577; *Bowles v. Willingham,* 321 U.S. 503, 518, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *Home Building & Loan Ass'n v. Blaisdell, supra; United States Trust Co. v. State of New Jersey, supra; see also California Teachers Association v. Newport Mesa Unified School District,* 333 F.Supp. 436, 444 (C.D.Cal.1971); *Veix v. Sixth Ward Building & Loan Ass'n, supra.* Accordingly, this court finds that the Moratorium Act does not violate the Due Process clause.

### C. *Equal Protection*

Plaintiff Ropico alleges that the Moratorium Act violates the Equal Protection Clause by denying certain rights to the holders of short-term city notes while leaving unaffected the rights of City bondholders and other creditors. Ropico argues that there is no rational basis for a distinction between bondholders and noteholders, and thus the Moratorium Act is unconstitutionally discriminatory.

In order for a legislative classification to be valid under the Equal Protection Clause in a matter involving fiscal policy, the state need only show that it bears some rational relationship to a legitimate state purpose. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1974); *Dandridge v. Williams,* 397 U.S. 471, 484–85, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). At the time of the passage of the Act there was a total of $3.149 billion in principal and interest on City short-term notes not held by MAC falling due within the next year. Total debt service on City bonds for the fiscal year 1975–76 on the other hand amounted to approximately $1.4 billion. It was thus clear that the requirements of the City short-term notes posed the greater threat to the City's financial stability. Under these circumstances, the distinction between holders of bonds and notes made by the Moratorium Act clearly bears a rational relationship to a legitimate state purpose, and is

valid under the Equal Protection Clause of the Constitution.[5] *See Blaisdell, supra,* 290 U.S. at 448, 54 S.Ct. 231; *Flushing Bank, supra.*

### D. *Access to Courts, Full Faith and Credit*

■ The complaints of both Ropico and Avins allege that the Moratorium Act is unconstitutional because it denies noteholders access to the courts. This court concludes that there is no merit to this claim. To the extent that it raises a due process objection, the claim must be denied for the reasons previously set forth. Furthermore, the Moratorium Act does not deny noteholders access to the federal courts, but only regulates the remedies which they have in connection with suing on certain notes. The noteholders are in no way precluded from suing to enforce their obligations in federal court to the degree that they have a remedy under state law or from challenging the validity of the Moratorium Act, as has been done in this very case.

■ Similarly without merit is Ropico's claim that the Moratorium Act violates the Full Faith and Credit Clause in Article 4, Section 1 of the Constitution. The Full Faith and Credit Clause by its terms requires that a state give full faith and credit to the public acts of other states, and does not affect the right of a state to repudiate acts of its own political subdivisions. *Pacific Employers Insurance Co. v. Industrial Accident Comm'n,* 306 U.S. 493, 501, 59 S.Ct. 629, 83 L.Ed. 940 (1939); *Pink v. A.A.A. Highway Express,* 314 U.S. 201, 210, 62 S.Ct. 241, 86 L.Ed. 152 (1941).

### III. *Bankruptcy Act Challenge*

Plaintiffs' final claim is that the Moratorium Act is a "composition of indebtedness"

in violation of Section 83(i) of Chapter IX of the Bankruptcy Act, 11 U.S.C. § 403(i) (now Section 83 of the Act, 11 U.S.C. § 403, P.L. 94–260 (April 8, 1976)).[6] Defendants on the other hand claim that the Moratorium Act at most provides for a temporary extension of defendants' obligations and is not prohibited by the proviso in Section 83. The court concludes that the Moratorium Act provides for an extension rather than a composition and therefore does not violate the Bankruptcy Act.

Section 83 provides:

Nothing contained in this chapter shall be construed to limit or impair the power of any State to control, by legislation or otherwise, any municipality or any political subdivision of or in such State in the exercise of its political or governmental powers, including expenditures therefor: *Provided, however,* that no State law prescribing a method of composition of indebtedness of such agencies shall be binding upon any creditor who does not consent to such composition, and no judgment shall be entered such State law which would bind a creditor to such composition without his consent.

A review of the background and history of this Section proves useful in deciding the issue before the court. As originally enacted in 1934, the Municipal Bankruptcy Act did not include the provision quoted above. In *Ashton v. County Water Improvement District,* 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309 (1936), the Supreme Court held the original Municipal Bankruptcy Act, which was approved by Congress in 1934, Act of May 24, 1934 c. 345, 48 Stat. 798 (11 U.S.C. §§ 301 *et seq.*), an unconstitutional infringement on state sovereignty. In 1937 Congress enacted a second Municipal Bankruptcy Act (then Chapter X of the Bank-

---

5. Distinctions between bonds and notes have been made for a variety of purposes. *See* N.Y. Const. art. VIII, §§ 2, 5A.

6. It should also be noted that in addition to the challenge under Section 83(i), Ropico in its sixth cause of action alleges that the Moratorium Act violates Article I, Section 8, clause 4 of the Constitution which provides that Congress

shall have the power to establish uniform bankruptcy laws. For purposes of the analysis here, it has been assumed that any prohibition resulting from an application of this constitutional provision in concert with the general provisions of the Bankruptcy Act is coextensive with the prohibition of state composition laws in Section 83.

ruptcy Act) which provided that nothing in the Act was to be construed as limiting the right of any state to control any municipality in the exercise of its political functions. § 83(i), Act of August 16, 1937, 50 Stat. 654. This same provision appears in the first sentence of what is presently Section 83. In *United States v. Bekins*, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1938), the Supreme Court relying on these new provisions, upheld the constitutionality of this second act.

Four years later, in *Faitoute Iron & Steel Co. v. City of Asbury Park, supra*, 316 U.S. at 508–509, 62 S.Ct. 1129, the Supreme Court concluded that the Municipal Bankruptcy Act did not render state municipal insolvency laws inoperative. The Court held that the City of Asbury Park could, pursuant to a New Jersey Municipal Finance Act, require dissenting creditors to accept a plan whereby their original bonds were converted into refunded bonds bearing a lower interest rate and having a later maturity date. The New Jersey statute there in question prohibited any plan of adjustment or composition of a municipality's debts which involved a reduction of principal, and required that any plan be approved by 85% of the creditors and by a state court. 316 U.S. at 504, 62 S.Ct. 1129. The Supreme Court rejected the argument that Congress by the enactment of Chapter IX preempted such state municipal bankruptcy laws, stating:

> Not until April 25, 1938, was the power of Congress to afford relief similar to that given by New Jersey for its municipalities clearly established, *United States v. Bekins*, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137, and then only because Congress had been "especially solicitous to afford no ground" for the "objection" that an exercise of federal bankruptcy over political subdivisions of the State "might materially restrict its control over

its fiscal affairs" whereby states would no longer be "free to manage their own affairs." The statute was "carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised . . . only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law. 304 U.S. at 50, 51, 58 S.Ct. at 815. . . .

> Can it be that a power that was not recognized until 1938, and when so recognized, was carefully circumscribed to reserve full freedom to the States, has now been completely absorbed by the federal government—that a state which, as in the case of New Jersey, has after long study devised elaborate machinery for the autonomous regulation of problems so peculiarly local as the fiscal management of its own household, is powerless in this field? We think not. 316 U.S. at 508–09, 62 S.Ct. at 1133.

In 1946, the language of the proviso forbidding state composition laws, presently contained in the second sentence of Section 83, was added to the Act. Although the legislative history of this amendment is sparse, it does appear that it was intended in some respects to modify the rule of *Faitoute*. At the House hearing the only direct reference to this provision and the policy behind it was in the testimony of Millard Parkhurst, a Dallas attorney engaged in municipal bond practice. He stated that the purpose of the proposed amendment was to change the holding of the *Faitoute* case to prevent state legislatures from enacting their own municipal bankruptcy laws, and thus to insure uniformity of municipal bankruptcy procedures.[7] Hearings on H.R. 4307, 79th Cong., 2d Sess. 15–16 (1946). These views appear to have been

---

7. The full text of Parkhurst's oral testimony with respect to this issue is as follows:

Now, on page 18, line 3, this part is now from there to the end of the paragraph: *Provided, however,* That while this chapter is in effect, no State law prescribing a meth-

od of composition of indebtedness of such agencies shall be binding upon any creditor *who does not consent to such composition,* and no judgment shall be entered under such State law which would bind a creditor to such composition without his consent.

carried almost verbatim into the House Committee Report, which states:

> An amendment to section 83(i) provides that State legislation dealing with compositions of municipal indebtedness shall not be binding on non-consenting creditors. State adjustment acts have been held to be valid, but a bankruptcy law under which bondholders of a municipality are required to surrender or cancel their obligations should be uniform throughout the 48 States, as the bonds of almost every municipality are widely held. Only under a Federal law should a creditor be forced to accept such an adjustment without his consent. H.R.Rep. No. 2246, 79th Cong., 2d Sess. 4 (1946); *U.S. Code Congressional Service*, 1946, pp. 1246, 1249.

In the original House version of the 1976 revision of Chapter IX, this 1946 amendment was omitted. The House Report, H.R. No. 94–686, 94th Cong., 2d Sess. 2 (1976), U.S.Code Cong. & Admin.News 1976, p. 771, gives the following reason for the original deletion of the proviso:

> The second amendment deletes the proviso found in current section 83(i), which was added in 1946 to overrule *Faitoute Iron and Steel Co. v. City of Asbury Park*. Though it is desireable [sic] to have a procedure that adjusts the rights of security holders be uniform throughout the country, the Committee feels that the Contracts Clause of the Constitution places such close restrictions on what the States may accomplish through their own composition procedures, that any nonuniformity that might result from the deletion of the restriction would be minimal and would not outweigh the interests of the States in the management of their own fiscal affairs, where they are able to

That is another instance where I thought that was the law anyway, but I understand that it is not.

Under the Asbury Park case, decided by the Supreme Court, 316 U.S. 502 [62 S.Ct. 1129], that case held that the State had the rights to enact municipal bankruptcy legislation. Now, in that case it was contended that the New Jersey bankruptcy law was invalid for 2 years. First, that the field of municipal bankruptcy legislation had been preempted by Congress. Second, on the broader ground that States do not have the power to enact bankruptcy laws. The opinion first observed was that the State court proceeding originated before the present bankruptcy law was passed. That Asbury Park case originated in the State court under the State bankruptcy law, and it originated in the State court before our present Federal law was passed. And the court held that for that reason the field had not been preempted at that time by Congress and the State court had jurisdiction. That part of the opinion would not be surprising to me, but the opinion then went on and said this, and I will quote these few words, "We prefer, however, to dispose of this objection on a broader ground," and then the court went on to hold, first, that the State legislature had the power to enact municipal bankruptcy laws; and, second, that Congress by this act had preempted the bankruptcy law field. So, the 48 States can have their bankruptcy laws running right along at the same time as our Federal bankruptcy law.

Of course, these municipal bonds are scattered in all of the 48 States. Bonds in my State, I know, are held from coast to coast; every State in the Union.

Mr. Hobbs. That would obviate the application of the Constitution in a State that may not impair the obligation of a contract?

Mr. Parkhurst. Yes. The opinion found, or one of the ways they arrived at that decision was that the opinion or the evidence showed, that the bonds of Asbury Park had gone way down in market value, and that the bankruptcy proceeding had in effect increased their market value so that the holder of those bonds had not lost so much money after all. That was one of the reasons underlying the Asbury decision. The court held that it was such a magnanimous act for the bondholders that they should not be heard to complain.

With these bonds of municipalities scattered all over the United States, it is even more imperative that this type of law should be of general even application all over the United States than it is for bankruptcies to affect private individuals. And I certainly think that is what the people meant when they wrote into the Constitution of the United States the authority for Congress, and I will quote these words from the Constitution: to establish * * * uniform laws on the subject of bankruptcies throughout the United States. Hearing on H.R. 4307, 74th Cong. 2d Sess. 15–16 (1946).

manage effectively without the aid of a Federal municipal adjustments statute. (footnote omitted)

The House Report further explains why the final version of the 1976 revision retained the proviso stating:

The proviso in current section 83(i), retained here, prohibiting state composition procedures was enacted in response to, and overruled the holding of the Supreme Court in *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 [62 S.Ct. 1129, 86 L.Ed. 1629] (1942). In that case, the court upheld a New Jersey statute that permitted a binding composition of a municipality's debts upon the acceptance of a plan by 85% of the municipality's creditors. The composition dealt only with unsecured obligations and the state statute prohibited reduction in the principal amount of the outstanding obligations. The Court refused to go beyond the facts of the case, holding only that the Contracts Clause of the Constitution did not prohibit that particular composition.

The proviso is retained for the same reason it was enacted by Congress . . (footnote omitted)

The Report then quotes the language of the 1946 Committee Report cited above. H.R.Rep. No. 94–686, 94th Cong., 2d Sess. 19 (1976); U.S.Code Cong. & Admin.News, 1976, p. 789.

■ The defendants contend that the re-enactment of this provision without any change in the statutory language after the Moratorium Act had been upheld by the lower court in the *Flushing Bank* case indicates legislative approval of that judicial interpretation. However, while it is true that as a general rule there is a presumption that the reenactment of a statute after a prior judicial construction is an indication of legislative approval of that construction of the statute, *McCaughn v. Hershey Chocolate Co.*, 283 U.S. 488, 492–93, 51 S.Ct. 510, 75 L.Ed. 1183 (1931); *Smolin v. First Fidelity Savings and Loan Co.*, 238 Md. 386, 209 A.2d 546, 549 (1965); 2A Sutherland on Statutory Construction § 49.09 (4th Ed.

1973), the applicability of this presumption is unclear where, as here, an appeal of the lower court interpretation is pending. In these circumstances and in view of the House Report, this Court is unable to conclude, for the purposes of deciding whether the Moratorium Act is in violation of the Bankruptcy Act, that the intent of the legislative enactment was to do any more than leave the previous law unchanged. Accordingly, this court must reach the question of whether the Moratorium Act is a law prescribing a method of composition or merely an extension. The answer to that question must be found in the definition of these terms as they are used in the context of federal bankruptcy law.

Neither Chapter IX nor case law interpreting the Bankruptcy Act explicitly defines the phrase "state law prescribing a method of composition," as set forth in Section 83. There also is no explicit definition in Chapter IX of what a "composition" is. Section 90 of the current Bankruptcy Act, 11 U.S.C. § 410 (1976), refers to the filing of "a plan for the adjustment of the petitioner's debts." Section 91 of the Act, 11 U.S.C. § 411 (1976), states:

A petitioner's plan may include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through issuance of new securities of any character, or otherwise, and may contain such other provisions and agreements not inconsistent with this chapter as the parties may desire . . .

This language appears to be analogous to certain language in Section 83(a) of the previous Chapter IX, 11 U.S.C. § 403(a) (1946), which was entitled "Composition—Petition; plan of composition; creditors." In that section, it was stated:

The "plan of composition", within the meaning of this chapter, may include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through issuance of new securities of any character, or otherwise, and may contain such other provisions and agreements not

inconsistent with this chapter as the parties may desire.

Chapter XIII of the Bankruptcy Act also contains language referring to a "plan of composition or extension, or both." 11 U.S.C. § 1006(6), (7); § 1023. Similarly, in Chapter VIII of the Act there are provisions for the filing by a farmer of a petition for "a composition or an extension of time to pay his debts," 11 U.S.C. § 203(c), which are later referred to in the same statute as a "composition or extension proposal." 11 U.S.C. § 203(e), (g), (h), (j), (k), (m), (s) (1946). In addition, in Chapter XI of the Act there are references to arrangements which are defined as "any plan of the debtor for the settlement, satisfaction, or extension of the time of payment of his unsecured debts, upon any terms." 11 U.S.C. § 706(1). A subsequent section of Chapter XI relates solely to "an arrangement providing for an extension of time for payment of debts in full". 11 U.S.C. § 707 (1938).

Thus, in these examples, when the term "composition or extension" is used in both Chapter VIII and Chapter XIII of the Bankruptcy Act, and a similar concept is present in Chapter XI, no distinction is made between a composition and an extension. However, there are instances in which the Bankruptcy Act is recognized to distinguish between a composition and an extension.

For example, under Section 14c (5) of the Bankruptcy Act, 11 U.S.C. § 32(c)(5) (1957), a court cannot grant a discharge to a bankrupt if the bankrupt

> . . . in a proceeding under this title commenced within six years prior to the date of the filing of the petition in bankruptcy had been granted a discharge, or had a composition or an arrangement by way of composition or a wage earner's plan by way of composition confirmed under this title.

The Supreme Court in *Perry v. Commerce Loan Co.*, 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966) held that this provision, which specifically refers only to compositions, cannot be invoked to bar court confirmation of an extension by virtue of a prior discharge in bankruptcy, stating:

> Extension plans, therefore, differ materially from straight bankruptcy arrangements under Chapters XI and XII, and wage-earner plans by way of composition, all of which contemplate only a partial payment of the wage earner's debts. Indeed, under an extension plan, the wage earner who makes the required payments will have paid his debts in full and will not need a discharge, even though the Act provides for a formal one. § 660. 383 U.S. at 398–99, 86 S.Ct. at 856.

Moreover, the distinction drawn by the *Perry* court has been similarly recognized in cases arising under Chapter XI, *In re Verlin*, 148 F.Supp. 660 (E.D.N.Y.1957), aff'd, 255 F.2d 682 (2d Cir. 1958), and in slightly different contexts in cases arising under Chapter VIII, *Heldstab v. Equitable Life Assurance Soc. of United States*, 91 F.2d 655, 658 (10th Cir. 1937); *In re Hoag*, 62 F.Supp. 527 (D.Vt.1945).

Furthermore, Section 74 of the 1933 revision of the Bankruptcy Act contained similar language which made the distinction between a composition and an extension, and it is significant that a 1933 commentary on that provision stated:

> Thus it is plain from the face of the statute that a composition is a present settlement and an extension is a moratorium, and that the two are entirely distinct and separate. If the proposal is to reduce debts, it is a composition; if the proposal is merely to postpone payment, it is an extension. . . . Garrison, *The New Bankruptcy Amendments: Some Problems of Construction*, 8 Wisc.L. Rev. 291, 294 (1933).

Plaintiffs argue that the reduction in the interest rates to six percent during the moratorium period after stated maturity effectively makes this case indistinguishable from the *Faitoute* case where there was also no reduction in principal. However, the Moratorium Act is distinguishable from the *Faitoute* situation in that here the noteholders receive the full amount of interest

up to the date of maturity and then six percent interest during the extension period. In most of the cases the exact terms of the extension or composition are not entirely clear, and thus it is difficult to say with certainty how much interest, if any, was actually paid during the extension. However, it is clear that during the extension period only the principal without interest need be paid on a non-interest bearing debt. *See In re Verlin, supra* at 662; *Heldstab v. Life Assurance Soc. of United States, supra* at 657; *In re Mahaley,* 187 F.Supp. 229, 232 (S.D.Cal.1960); *In re Thompson, supra,* D.C., 51 F.Supp. 12 at 14; *see* 8 Collier on Bankruptcy ¶ 2.20 (1976); *cf. Green v. City of Stuart, Fla.,* 135 F.2d 33 (5th Cir. 1943), *cert. denied,* 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 460 (1943); *Bogart v. Miller Land & Livestock Co.,* 129 F.2d 772, 773 (9th Cir. 1942), *cert. denied,* 317 U.S. 690, 63 S.Ct. 266, 87 L.Ed. 553 (1942). Under these circumstances, so long as the contract rate of interest on the notes is paid until the original maturity date, the fact that the Moratorium Act provides for payment at a lower rate of interest after that date does not render that Act a law of composition.

■ Accordingly, this court holds that the Moratorium Act is an extension and not a proscribed composition. In so holding the court does not decide what the result would be if the post-maturity interest rate were lower than the six percent provided. Nor does it decide what its holding would be if the period of extension were greater than three years. It can be argued that the suspension of the right to receive a short-term note may in some cases be in effect an impairment of the value of the underlying obligation—similar to a partial cancellation or surrender. Whatever the economic reality in this situation, the statutes and cases discussed above have clearly determined that as a legal matter, an extension is to be treated differently from a composition. Nevertheless, this distinction must at some point, because of the length of the extension or the rate of interest after maturity, become blurred. The court merely holds that the Moratorium Act, as presently enacted with a three year suspension at six

percent interest, does not amount to a composition.

There is another factor here which weighs heavily in favor of the court's interpretation of the proviso in Section 83. The history of Chapter IX and of the Bankruptcy Act in general and Section 83 in particular is one of continuous tension between state sovereignty and the application of the federal bankruptcy power. While the Supreme Court has in several cases invalidated state laws which were found to conflict with the Bankruptcy Act, *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *International Shoe Company v. Pinkus,* 278 U.S. 261, 49 S.Ct. 108, 73 L.Ed. 318 (1929), as have several lower courts, *see, e. g., First National Bank in Albuquerque v. Robinson,* 107 F.2d 50 (10th Cir. 1939); *In re Wisconsin Builders Supply Co.,* 239 F.2d 649 (7th Cir. 1956), *cert. denied sub. nom. Prentice v. Moskowitz,* 353 U.S. 985, 77 S.Ct. 1286, 1 L.Ed.2d 1143 (1957), it has also in other cases sustained provisions arguably affecting the bankruptcy power where the state laws were not directly in conflict with the Bankruptcy Act, *Pobreslo v. Joseph M. Boyd Co.,* 287 U.S. 518, 53 S.Ct. 262, 77 L.Ed. 469 (1933); *Johnson v. Star,* 287 U.S. 527, 53 S.Ct. 265, 77 L.Ed. 473 (1933); *Kesler v. Department of Public Safety, State of Utah,* 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962); *Stellwagen v. Clum,* 245 U.S. 605, 38 S.Ct. 215, 62 L.Ed. 507 (1918).

In the area of municipal reorganizations the thin line between the federal bankruptcy power and state sovereignty has been particularly difficult to draw. Both Congress and the Supreme Court have thus been careful to stress that the federal municipal Bankruptcy Act is not in any way intended to infringe on the sovereign power of a state to control its political subdivisions; for as the Supreme Court held in the *Ashton* and *Bekins* cases, to the extent that the federal Bankruptcy Act does infringe on a state or a municipality's function it is unconstitutional.

This challenge to the Moratorium Act in these cases raises significant problems in

this respect. A federal court decision that the federal Bankruptcy Act precludes the New York State legislature from implementing this emergency measure aimed at dealing with a fiscal crisis of unprecedented proportions affecting its largest city would raise very serious questions about the right of a state effectively to govern its political subdivisions.

For all of the foregoing reasons, defendants' motions for summary judgment are in all respects granted. Plaintiffs' cross-motions for summary judgment are denied and the complaints in both actions are dismissed pursuant to Rule 12(b)(6). The clerk is directed to enter judgment accordingly.

So Ordered.