FLUSHING NATIONAL BANK, on Behalf of Itself and All Other Holders of Notes of the City of New York Maturing on or before June 30, 1976, Appellants, v MUNICIPAL ASSISTANCE CORPORATION FOR THE CITY OF NEW YORK et al, Respondents, and STATE OF NEW YORK, Defendant.

First Department, May 4, 1976

*Arthur Richenthal* of counsel *(Richenthal, Abrams & Moss,* attorneys), for appellants.

*Simon H. Rifkind* of counsel *(Robert L. Laufer, Dean B. Allison, Howard S. Veisz* and *Jonathan Siegfried* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for Municipal Assistance Corporation for the City of New York, respondent.

*W. Bernard Richland, Corporation Counsel (James G. Greilsheimer, L. Kevin Sheridan, Leonard Koerner* and *James Griffin* with him on the brief), for City of New York and others, respondents.

*Shirley Adelson Siegel* of counsel *(Samuel A. Hirshowitz* with her on the brief; *Louis J. Lefkowitz, Attorney-General),* for New York State Emergency Financial Control Board, respondent.

LANE, J. This action was brought, *inter alia,* to declare the invalidity of the "New York State Emergency Moratorium Act for the City of New York" (L 1975, chs 874 and 875). The further injunctive relief sought has since been rendered academic and is not the subject of this appeal.

The Emergency Moratorium Act (EMA) provides for a conditional three-year moratorium on enforcement of outstanding short-term obligations of the City of New York. The short-term city obligations involved tax anticipation notes, bond anticipation notes, revenue anticipation notes, budget notes, and urban renewal notes.

The moratorium is conditioned upon an offer having been made to exchange the short-term obligations with a replacement obligation[1] having a date of maturity no more than 20 years after the date of maturity of the short-term obligation.

Should a short-term noteholder decline to accept the exchange offer, then payment on principal is to be suspended for a three-year period. Payment of interest thereon is provided at the rate stated in the obligation to the date of its maturity and thereafter at a rate of not less than 6% per annum. Interest payments are to be made at least annually. The city is not precluded from issuing other evidence of indebtedness to consenting shareholders in payment, renewal, or refunding of the short-term obligations.

The EMA legislation is alleged to be infirm in that it violates the Federal and State Constitutions. The plaintiff, Flushing National Bank, further urges that the 6% interest rate paid after maturity of the notes is confiscatory[2] and that the EMA violates the Federal Bankruptcy Act.

We must note at the outset that the EMA was not enacted by the Legislature arbitrarily or in a vacuum but is the latest in a series of legislative efforts to restore the city's financial integrity.

The first such special legislation, in June, 1975, involved the creation of the Municipal Assistance Corporation (L 1975, ch 168), which corporation was authorized to issue and sell its own bonds and notes and thereby to aid the city by purchasing city obligations or making direct payments to it.

This was followed by enactment of the New York State Financial Emergency Act in September, 1975 (L 1975, chs 868-870), which created a board to review, control and supervise the financial management of the city.

The present EMA (L 1975, chs 874-875), enacted in November, 1975, is the latest of such legislation.

In passing each item of legislation, there was a finding that the city was in need of assistance in order to maintain its essential services and financial stability, the failure of which would have grave impact city-wide and the ripples of which would be felt State-wide, and even nation-wide.

---

1. Defined as "a bond, note or other evidence of indebtedness of the municipal assistance corporation for the city of New York" (ch. 874, § 2, subd 4).

2. Flushing bases this claim on a comparison with interest paid on other short-term obligations of subdivisions of New York State.

The sense of urgency in these finding has become intensified as the fullness of the dimensions of the financial crisis made its impact on the Legislature.

The city's difficulties were first characterized as "cause [for] concern" (L 1975, ch 168, § 1, enacting Public Authorities Law, art 10, especially § 3002), then resulted in the finding of "a financial emergency and an emergency period" (L 1975, ch 868, § 1), and ripened into a finding that "the grave public emergency * * * has dramatically worsened" (L 1975, ch 874, § 1, legislative findings).

Each piece of remedial legislation enacted received great consideration, and the legislative findings published at the head of each act reveal that all involved were mindful of the dire consequences attendant upon a failure to ameliorate a fast deteriorating fiscal condition. The Legislature was similarly concerned with maintaining investor receptivity and respect for the pledge of the faith and credit of the city to payment of its obligations. Keeping this perspective in mind, it would appear that the EMA is not a "Law impairing the Obligation of Contracts" violative of the United States Constitution (art I, § 10).

Nothing in the EMA articulates an intent not to honor the obligation evidenced by the short-term obligations of the city, but it rather establishes a revised schedule for payment of these obligations. Traditionally, there has been a distinction drawn between the obligation of a contract and the remedies available to enforce that obligation. Modification of a remedy can obtain without impairing the obligation of a contract *(Sturges v Crowninshield,* 4 Wheat [17 US] 122, 200). It has also been noted that: "It is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances" *(Von Hoffman v City of Quincy,* 4 Wall [71 US] 535, 553-554).

The reasonableness of the modification of the remedy must be left to the judgment and discretion of the Legislature, which discretion should not be disturbed absent palpable error *(Antoni v Greenhow,* 107 US 769, 775; *East N. Y. Bank v Hahn,* 326 US 230, 233).

The case at bar is dealing neither with a modification of remedy which gives no immediate payment to the creditor *(Worthen Co. v Thomas,* 292 US 426), nor with holders of obligations with a divesting of property rights *(Wood v Lovett,* 313 US 362) but, rather, with a mere extension of time to make full payment.

The EMA legislation has not rendered the short-term notes invalid, nor has it released or extinguished them. What it has done in the present financial emergency is afford a reason for the State's exercise of its inherent powers, which include the right to police and modify remedial processes and to safeguard the essential interests of the People of the State. Implicit in every contract or obligation is the gloss of existing laws as well as the gloss of essential sovereign powers reposed in the State *(Home Bldg. & Loan Assn. v Blaisdell,* 290 US 398, 434-435; *Faitoute Co. v Asbury Park,* 316 US 502, 511; *East N. Y. Bank v Hahn, supra,* p 232; *El Paso v Simmons,* 379 US 497, 508-509).

Absent such State powers, reasonably exercised, the viability of contracts, public or private, would be most tenuous. To deny a State a method of affording a modified remedy (e.g., via extension of time to pay) and simultaneously to allow rigid enforcement of those outstanding obligations would be to espouse a concept of every man for himself, which would be destructive of potential public resources and inimical to the survival of the State.

As Chief Justice HUGHES so aptly stated in this regard: "The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society" *(Home Bldg. & Loan Assn. v Blaisdell, supra,* p 435).

The principles enunciated apply with equal vigor to both private and public obligations. With regard to the latter, it has been recognized that the principal asset of a governmental authority is its taxing power. As Justice FRANKFURTER so cogently noted in *Faitoute Co. v Asbury Park (supra,* p 509):

"An unsecured municipal security is * * * merely a draft on the good faith of a municipality in exercising its taxing power. The notion that a city has unlimited taxing power is, of course, an illusion. A city cannot be taken over and oper-

ated for the benefit of its creditors, nor can its creditors take over the taxing power. Indeed, so far as the Federal Constitution is concerned, the taxing power of a municipality is not even within its own control—it is wholly subordinate to the unrestrained power of the State over political subdivisions of its own creation. 'A municipal corporation * * * is a representative not only of the State, but is a portion of its governmental power * * * The State may withdraw these local powers of government at pleasure, and may, through its legislature or other appointed channels, govern the local territory as it governs the State at large. It may enlarge or contract its powers or destroy its existence.' *United States v. Railroad Company,* 17 Wall. 322, 329. And see *Hunter v. Pittsburgh,* 207 U.S. 161.

"In effect, therefore, the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power."

He further noted (p 511): "Impairment of an obligation means refusal to pay an honest debt; it does not mean contriving ways and means for paying it. The necessity compelled by unexpected financial conditions to modify an original arrangement for discharging a city's debt is implied in every such obligation for the very reason that thereby the obligation is discharged, not impaired."

The conclusion articulated in the *Asbury Park* case is inescapable; namely (pp 515-516): "[S]tate intervention, carefully devised, worked out with scrupulous detail and with due regard to the interests of all the creditors, and scrutinized to that end by the state judiciary with the result that that which was a most depreciated claim of little value has, by the very scheme complained of, been saved and transmuted into substantial value. To call a law so beneficent in its consequences on behalf of the creditor who, having had so much restored to him, now insists on standing on the paper rights that were merely paper before this resuscitating scheme, an impairment of the obligation of contract is indeed to make of the Constitution a code of lifeless forms instead of an enduring framework of government for a dynamic society."

As to the alleged violation of our New York State Constitution (art VIII, §§ 2, 10, 12), we merely note that the mandate of these sections has not been violated by the EMA legislation. The city has pledged its faith and credit for payment of its obligations and the city has not violated the strictures of

sections 10 and 12 relating to the city's power to levy real estate taxes.

As to the claim that the interest rate of 6% offered on matured notes is inadequate and confiscatory, it must be noted that this amount is double that available on any other judgment or accrued claim against the city (General Municipal Law, § 3-a). Furthermore, it must be remembered that the rate paid is for matured notes, while the comparisons made by Flushing are with interest rates offered on unmatured notes. As to the alleged violation of the Bankruptcy Act, it must merely be noted that we are dealing here with an extension of the time for payment of an indebtedness and not the "composition of indebtedness" encompassed by the Federal Bankruptcy Act.

In sum, we are concerned with that which Justice FRANKFURTER in a similar case described as "the empiric process of legislation at its fairest: frequent reconsideration, intensive study of the consequences of what has been done, readjustment to changing conditions, and safeguarding the future on the basis of responsible forecasts" *(East N. Y. Bank v Hahn,* 326 US 230, 234-235, *supra).*

Accordingly, the judgment of the Supreme Court, New York County, entered December 24, 1975, declaring chapters 874 and 875 of the Laws of 1975 to be valid, should be affirmed, without costs.

MARKEWICH, J. P., LUPIANO, BIRNS and CAPOZZOLI, JJ., concur.

Judgment, Supreme Court, New York County, entered on December 24, 1975, unanimously affirmed, without costs and without disbursements.