**VTECH HOLDINGS LIMITED, et ano., Plaintiffs,**

v.

**PRICEWATERHOUSE COOPERS LLP, Defendant.**

**No. 03 Civ.1413(LAK).**

United States District Court, S.D. New York.

Dec. 14, 2004.

Ridley M. Whitaker, Law Offices of Ridley M. Whitaker, for Plaintiffs.

Michael R. Young, James C. Dugan, Michael P. Bosher, Willkie, Farr & Gallagher LLP, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiffs VTech Holdings, Ltd. and VTech Europe B.V. (collectively "VTech") claim that defendant Pricewaterhouse-Coopers ("PwC") is partly to blame for its unsuccessful acquisition of the consumer telephone business of Lucent Technologies, Inc. and Lucent Technologies Consumer Products, LP (collectively "Lucent"). Plaintiffs seek recovery on theories of accounting malpractice, breach of contract, breach of fiduciary duty, aiding and abetting the fraudulent activities of Lucent, fraud and fraudulent concealment. PwC moves to dismiss the Second Amended Complaint on the ground that it fails to state a claim upon which relief may be granted and fails to plead fraud with particularity.

## I

### A. The Independent Auditor Agreement

In late 1999, VTech proposed to acquire Lucent's consumer telephone division, known as the "Wired Business."[1] To complete the acquisition, VTech sought the approval of its shareholders and hired PricewaterhouseCoopers of Hong Kong ("PwC Hong Kong") in connection with the preparation of a Circular describing the deal. The Circular, which was required by the London and Hong Kong stock exchanges, consisted of a letter from the board of VTech recommending the purchase, an accountant's report by PwC Hong Kong on the Wired Business, and general and financial information relating to VTech.[2]

According to the plaintiff, in early January 2000, VTech and PwC (as distinguished from PwC Hong Kong) entered into an oral agreement that PwC would assist in preparing the Circular and that it would serve as VTech's independent auditor in connection with the proposed acquisition.[3] VTech alleges that PwC was supposed to "prepare and provide VTech with financial records pertaining to the Lucent Business which were necessary for inclusion in the Circular."[4] Prior to entering into its oral agreement with VTech, PwC had disclosed that it was Lucent's auditor and assured VTech that this conflict would not be a problem.[5]

PwC subsequently told VTech that it could not conduct a full audit of the Wired Business because Lucent had not prepared

---

**1.** Young Aff., Ex. 1, Second Amended Complaint ("Cpt.") ¶¶ 7, 14, 19.

**2.** *Id.* ¶¶ 15–18.

**3.** *Id.* ¶ 15.
The Court is obliged to assume the truth of this allegation of purposes of this motion. The likelihood that a major accounting firm

actually took on a professional engagement from a client without a written engagement, however, is exceptionally small.

**4.** *Id.*

**5.** *Id.* ¶ 16.

separate accounts on a standalone basis.[6] PwC Hong Kong encountered this problem as well and disclosed it in its accountant's report in the Circular.[7] As they could not analyze the accounts independently, PwC and PwC Hong Kong relied on a representation letter of Lucent management dated March 1, 2000, which stated that:

> "[t]o the best of our knowledge and belief, no events have occurred subsequent to 30th September, 1999 and through the date of this letter that would require adjustment to or disclosure in the combined financial information, except for the U.S. $2.2 million adjustment to the warranty provision which has been reflected in the combined financial information and the sale of the Wired Business to VTech."[8]

Although PwC Hong Kong prepared the Circular as a whole and signed the accountant's report in it, VTech alleges that PwC caused an excerpt from Lucent's letter to appear in footnote eleven of that report.[9] The footnote stated that: "[i]n the opinion of Management of LTCP [Lucent], no significant events have taken place subsequent to 30th September, 1999."[10]

VTech alleges that PwC neglected and refused to investigate the accuracy Lucent's opinion and that, had it done so, it would have found that Lucent management did not in fact hold this opinion.[11] Moreover, it alleges that PwC could have evaluated the accounts of the Wired Business and that this data had been extracted from Lucent's books for another prospective buyer in 1999.[12]

VTech now alleges that significant adverse events regarding Lucent's consumer telephone products had occurred between September 30, 1999 and January 19, 2000. During that period, the Wired Business had accumulated more than two hundred thousand Falcon and Osprey telephone products that it was unable to sell.[13] Moreover, its sales and production forecasts had declined, and independent testing had established that the Falcon telephone product was so faulty as to be unmarketable.[14]

PwC allegedly knew about these problems in its capacity as auditor for Lucent. VTech claims that PwC concealed these adverse events so as not to jeopardize its relationship with Lucent.[15]

## B. *The Business Advisory Agreement*

In order to integrate the soon to be acquired Wired Business into the company, VTech sought to hire PwC as its business advisor. In December of 1999, PwC told VTech that one of the people working on the proposed business advisory project would be Steven Smith, a PwC partner

---

6. *Id.* ¶ 19.

7. Young Aff., Ex. 3, Circular at 20–21.

8. Cpt. ¶ 24. The "combined financial information" consisted of:
 "a compilation of assets and liabilities as at 30th September 1999 to be purchased by VTech and a compilation of revenues and expenses for the two years ended 31st December 1998 and the nine months ended 30th September 1999 and have been presented as a statement of combined net assets to be purchased by VTech and a statement of combined revenues and expenses." *Id.* ¶ 25.

9. *Id.* ¶¶ 22–23.

10. *Id.* ¶ 22.

11. *Id.* ¶ 28.

12. *Id.* ¶ 20.

13. *Id.* ¶ 18.

14. *Id.*

15. *Id.* ¶¶ 123–25, 181.

who had been in charge of the Lucent audit.[16]

Relying on the promise that the engagement would be staffed with people knowledgeable about Lucent, VTech hired PwC as its business advisor on January 27, 2000 pursuant to a written agreement.[17] As VTech's business advisor, PwC stated it would:

"[a]ssess the relative financial impact and probability of success of key management actions[;] * * *"

"[c]onduct focus group meetings with a sampling of employees ... to capture feedback on their understanding of the reasons for the changes";[18] and

"combine the information we obtain from these interviews with financial data and other company information to build a detailed, interactive model of the important post-deal actions."[19]

The agreement provided also that PwC would create transition teams, identify and work through organizational and cultural obstacles to integration,[20] and "staff the engagement to ensure continuity and incorporation of our knowledge of VTech/Lucent Wired operations."[21] PwC warranted that "the Services will be performed and supervised by qualified personnel."[22]

In February of 2000, PwC participated on behalf of VTech in an audit of inventory in Lucent's warehouse in Guadalajara, Mexico.[23] PwC personnel at the audit saw that the warehouse contained excessive inventory. VTech claims that the PwC people knew that this inventory build up was due to the poor sales of the Falcon and Osprey systems.[24] Steven Smith of PwC and the other personnel involved with the business advisory engagement for VTech did not inform it that the inventory in Mexico would not be merchantable. Instead, on April 4, 2000, Jeff Dufty of PwC told VTech that the products could be sold in the ordinary course of business using pricing incentives and promotional programs.[25]

## C. The Purchase Price Audit Agreement

On March 31, 2000, the deal between VTech and Lucent closed, and VTech acquired the Wired Business for approximately $121,266,000.[26] VTech then hired PwC to audit Lucent's final net current account statement ("NCAS"), which was defined in the Purchase Agreement between Lucent and VTech.[27] The NCAS was to be prepared on the basis of the estimated net current account statement ("ENCAS") and in accordance with generally accepted United States accounting principles ("GAAP").[28] The agreement obliged PwC to perform the audit so as to "obtain reasonable assurance about whether the NCAS is free of material misstate-

---

16. *Id.* ¶ 98.

17. *Id.* ¶¶ 39, 41, 45.

18. Young Aff., Ex. 5, Business Advisory Agreement, Jan. 27, 2000, at 3–4.

19. *Id.* at 2; Cpt. ¶ 44.

20. Young Aff., Ex. 5, Business Advisory Agreement, Jan. 27, 2000, at 5–6.

21. *Id.* at 7.

22. *Id.*

23. Cpt. ¶¶ 47–48.

24. *Id.* ¶ 48.

25. *Id.* ¶ 50.

26. *Id.* ¶¶ 7, 17.

27. *Id.* ¶ 62.

28. *Id.* ¶ 66; Young Aff., Ex. 6, Purchase Price Audit Agreement, at 1.

ment."[29] This assurance was limited, however, as PwC stated that it could not "ensure that errors, fraud or other illegal acts, if present, will be detected."[30]

VTech asserts that the PwC's audit was faulty with respect to the value of certain of the inventory of the Wired Business. GAAP generally require a reduction in the valuation of inventory when its utility is no longer as great as its cost.[31] This devaluation is known as the reduction to fair market value ("RFMV") or "lower of cost or market" because it reduces the value of inventory to the cost at which it could be replaced at market value, not its production cost. Lucent used this method to value its inventory and had a formula for determining the reserve required for each product.[32] It also had guidelines that provided that the reserve calculations could be overridden by management in order to hold inventory without devaluing it when there were changes in sales forecasts, spot deals, or seasonal inventory build up.[33]

In the ENCAS, Lucent overrode the RFMV reserve calculation for five telephone models, including the Falcon and Osprey products.[34] There was evidence in litigation between VTech and Lucent suggesting that Lucent did so improperly to overvalue its inventory by $20 million and protect the purchase price of the deal.[35] PwC did not test the legitimacy of this override in the audit and apparently relied only on the opinion of executives of the Wired Business that it was appropriate.[36] Accordingly, on June 30, 2000, PwC opined to VTech that the override had been proper and done in accordance with Lucent's guidelines.[37]

## II

In resolving a motion to dismiss, the Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in the plaintiff's favor.[38] "[D]ismissal is appropriate if the plaintiff can prove no set of facts that would entitle him to relief."[39] The issue is not whether the plaintiff ultimately will prevail but whether the plaintiff is entitled to offer evidence to support its claims.[40]

Although Rule 12(b) motions are addressed to the pleadings,[41] PwC attached the Circular and the relevant engagement letters to its motion. This Court advised counsel that it intended to consider the three engagement letters and, to that limited extent, might convert the motion into one for summary judgment.[42] It then in-

29. Young Aff., Ex. 6, Purchase Price Audit Agreement, at 2.

30. *Id.* at 2–3.

31. JAN R. WILLIAMS, MILLER GAAP GUIDE § 27.03–.04 (2002).

32. Cpt. ¶¶ 68–73.

33. *Id.* ¶ 73.

34. *Id.* ¶¶ 68, 69, 71.

35. *Id.* ¶¶ 77–78.

36. *Id.* ¶ 82.

37. *Id.*

38. *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir.2001), *cert. denied,* 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002) (citing *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994)).

39. *Id.* (citing *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998)); *accord Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000).

40. *See, e.g., Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995).

41. FED. R. CIV. P. 12(b).

42. *Vtech Holdings Ltd. v. Pricewaterhousecoopers LLP,* No. 03 Civ. 1413(LAK), 2003 WL 23014360 (S.D.N.Y. Dec. 22, 2003).

vited VTech's counsel to "submit any evidence they contend raise a genuine issue of material fact with respect to the authenticity of or terms of the relevant engagements." [43] Plaintiffs do not dispute the authenticity of these documents and therefore summary judgment is granted as to their authenticity. [44]

The Circular also was attached to PwC's motion. The Second Amended Complaint quotes from and refers to it, thereby incorporating it by reference. [45] There is no dispute as to its authenticity. [46] The Court therefore considers it for the purposes of this motion. [47]

## A. Accountant Malpractice

VTech's first claim is for accountant malpractice based on PwC's statement in footnote eleven of the March 2, 2000 Circular produced by PwC Hong Kong. VTech alleges that PwC failed to exercise the requisite care in gathering information about Lucent and the validity of its opinion that there had been no significant changes

since September 30, 1999 that would alter the financial picture of the Wired Business. VTech claims that it relied on this statement and, as a result, suffered damages. PwC moves to dismiss this claim, arguing that VTech on several grounds has failed to state a claim.

To state a claim of professional malpractice under New York law, [48] VTech must allege a departure from accepted standards of practice and that the departure was the proximate cause of its injury. [49] VTech must allege also that it was in privity with PwC or had a bond " 'so close as to approach that of privity.' " [50]

PwC first asserts that VTech's claim fails because there was no contract between it and VTech with regard to the Circular. It contends that PwC Hong Kong, a separate legal entity, produced the Circular and all statements in it. [51] It argues that the existence of the written contract between VTech and PwC Hong Kong

43. *Id.*

44. *See VTech Holdings, Ltd. v. PricewaterhouseCoopers LLP*, No. 03 Civ. 1413(LAK), 2004 WL 1064513 (S.D.N.Y. May 12, 2004); Tr. May 28, 2004, at 2–4.

45. Paragraphs 19, 22, and 24 of the Second Amended Complaint quote from and refer to the Hong Kong Circular that was prepared for VTech by PwC Hong Kong.

46. *See* Tr. at 2.

47. *See Yak v. Bank of Brussels Lambert*, 252 F.3d 127, 130 (2d Cir.2001); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991).

48. The law of the forum state governs where, as here, neither party alleges that the law of a different state would control and differs from New York law. *See Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128, 133 n. 26 (S.D.N.Y.2000), *aff'd*, 2 Fed.Appx. 81 (2d Cir. 2001).

49. *Herbert H. Post & Co. v. Sidney Bitterman, Inc.*, 219 A.D.2d 214, 223, 639 N.Y.S.2d 329, 335 (1st Dep't 1996) (citing *Georgetti v. United Hosp. Med. Ctr.*, 204 A.D.2d 271, 272, 611 N.Y.S.2d 583, 584 (2d Dep't 1994)).

50. *Parrott v. Coopers & Lybrand, LLP*, 95 N.Y.2d 479, 483, 718 N.Y.S.2d 709, 711, 741 N.E.2d 506 (2000) (quoting *Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 382, 590 N.Y.S.2d 831, 832, 605 N.E.2d 318 (1992), *reh'g denied*, 81 N.Y.2d 955, 597 N.Y.S.2d 940, 613 N.E.2d 972 (1993)).

51. Memorandum of Law of Defendant PricewaterhouseCoopers, LLP in Support of Its Motion to Dismiss the Second Amended Complaint ("Def.Mem.") 4, 7–9; Reply Memorandum of Law of Defendant PricewaterhouseCoopers LLP in Support of its Motion to Dismiss the Second Amended Complaint ("Def.Reply.") 3 n. 4.

contradicts any allegation of an oral agreement for assistance by PwC.[52]

■ To be sure, a court is not required to accept as true allegations that are contradicted by documentary evidence that may be considered on a motion to dismiss. Here, however, VTech claims that it had an oral contract with PwC in regard to the Circular.[53] The existence of a written agreement between VTech and PwC Hong Kong does not directly preclude or contradict VTech's allegation of an oral agreement with PwC to assist in its preparation.

PwC next argues that the claim should be dismissed because VTech has failed to allege the terms of the agreement.[54] But this rule is inapposite. While a plaintiff must allege the essential terms of a contract in a claim for breach of contract,[55] VTech's claim here is for malpractice. A general allegation of privity therefore is sufficient.

■ PwC next asserts that VTech's claim is deficient as there can be no reliance on a misrepresentation or omission in a report that is not certified.[56] It contends that the statement at issue appeared in the accountant's report signed by PwC Hong Kong which explicitly cautioned that "[it] is not now possible for us to carry out sufficient audit and other procedures to enable us to express a true and fair opinion on the combined financial information shown below." [57] In other words, whether or not this statement was true, PwC argues that it could not have made a difference to VTech's decision-making because none of the financial information in the report was certified as accurate or complete.

The Court is unaware of any legal basis for the proposition asserted by PwC, and PwC has supplied none.[58] VTech here al-

52. Def. Reply 3 & n. 4.

53. Cpt. ¶ 15. The Court relies for this interpretation of the complaint on the statements of plaintiffs' counsel at oral argument.

54. Def. Reply 2 n. 2 (citing *Huntington Dental & Medical Co., Inc. v. Minnesota Mining and Manufacturing Co.*, No. 95 Civ. 10959(JFK), 1998 WL 60954 (S.D.N.Y. Feb. 14, 1998)).

55. *See Sud v. Sud*, 211 A.D.2d 423, 424, 621 N.Y.S.2d 37, 38 (1st Dep't 1995); *see also Ross v. FSG PrivatAir, Inc.*, No. 03 Civ. 7292(NRB), 2004 WL 1837366 (S.D.N.Y. Aug. 17, 2004).

56. Def. Mem. 7–8.

57. Young Aff., Ex. 3, Circular of Mar. 2, 2000, at 22.

58. The cases relied upon by PwC are inapposite.

*Adair v. Kaye Kotts Assocs., Inc.*, No. 97 Civ. 3375(SS), 1998 WL 142353 (S.D.N.Y. Mar. 27, 1998), was brought under Section 11(a)(4) of the Securities Act of 1933, 15 U.S.C. § 77k(a)(4), which renders an accountant liable for material misstatements and omissions in portions of registration statements prepared or certified by the accountant and included with the accountant's consent. The basis of liability in such cases is not negligence, and the statute affords liability for statements "prepared" as well as "certified" by the accountant.

*Wright v. Ernst & Young LLP*, 152 F.3d 169, 175–76 (2d Cir.1998), a Rule 10b–5 case, stands for the unremarkable proposition that an accountant cannot be held liable as a primary violator for a misstatement or omission in a statement made by someone else, even if it "substantially participated" in the alleged fraud, unless the accountant "certified, audited, prepared or reported" the statement. To rule otherwise, the Circuit held, would run afoul of the Supreme Court's rejection of aiding and abetting liability in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

*Katz v. Realty Equities Corp.*, 406 F.Supp. 802 (S.D.N.Y.1976), in the course of dismissing a Rule 10b–5 claim against an accounting firm, did refer to the firm's refusal to certify financial statements, but not to suggest that an accountant may be held liable under 10b–5

leges that PwC was negligent in causing the statement in footnote eleven to appear in the report and that this negligence caused it damages. While PwC Hong Kong's statement that it could not certify the validity of the financial disclosure appears to undermine VTech's claim that it relied on the report in deciding whether to move forward with the purchase, this goes to the weight of the evidence.

In the alternative, PwC asserts that this claim fails because the agreement between VTech and PwC Hong Kong to produce the Circular had a two-year prescriptive period and the claim therefore is barred by that agreement.[59] VTech, however, has not sued PwC (as distinguished from PwC Hong Kong) on that agreement. Indeed, PwC was not a party to it. In consequence, the contractual prescriptive period cannot bar this claim.

## B. *Breach of Contract*

VTech asserts that the purpose of the Business Advisory Agreement was for PwC to acquire all relevant financial information about the Wired Business and then advise VTech "concerning key business decisions respecting the acquisition of the Lucent Business."[60] The crux of the claim, however, is that PwC breached this agreement by "willfully fail[ing] to utilize the business records of the Lucent Busi-

ness," and "other financial information available to [it] ... as the Lucent Auditor."[61] Thus, it asserts that PwC breached the agreement by failing to examine and disclose the substance of Lucent business records and to combine that information with data gleaned from interviews of VTech and Wired Business personnel;[62] failing to "incorporate" the knowledge of Steven Smith, the PwC partner in charge of auditing Lucent, into its advice to VTech under the agreement;[63] and failing to take into account in advising VTech concerning the Guadalajara inventory "relevant data obtainable from the Lucent Business."[64] It asserts that these failures resulted in its purchase of the Wired Business and other losses after the deal closed. These assertions are baseless.

 To begin with, as Lucent's auditor, PwC was under a duty neither to disclose nor to use for the benefit of itself or anyone else, including VTech, material non-public information concerning Lucent that came to its attention by virtue of its relationship with that company.[65] The undertaking to staff the matter "to ensure continuity and incorporation of our knowledge of VTech/Lucent Wired operations" served no purpose beyond assuring that personnel who knew the business would be

---

only on the basis of a misstatement in a certified financial statement. Rather, it pointed to evidence that the accounting firm could not be held liable for inaccuracies in financial statements that it did not certify in circumstances in which it reported to the SEC and the issuer's shareholders that it would not certify the financial statements, the alleged nondisclosures were not material in the circumstances, and the plaintiff had failed to raise a genuine issue of material fact as to *scienter. Id.* at 805.

A more responsible use of authority would have been desirable.

59. Def. Mem. 9.

60. Cpt. ¶ 40.

61. *Id.* ¶ 54

62. *Id.;* Memorandum of Law of Plaintiffs VTech Holdings Limited and VTech Europe B.V. In Opposition to Defendant's Motion to Dismiss the Second Amended Complaint ("Pl. Mem.") 12.

63. Cpt. ¶ 70.

64. *Id.* ¶ 52.

65. *See, e.g.,* RESTATEMENT (SECOND) OF AGENCY § 395 (1958).

assigned.[66] The agreement therefore did not purport to obligate PwC to breach its duty to Lucent. Nor may such an obligation be imposed in the guise of construing that contract. The law wisely presumes that contracts, especially those drawn by attorneys as this was, are concluded "with reference to applicable law."[67] Put another way, the gloss of existing law is implicit in every contract.[68] The Court therefore will not infer from the Business Advisory Agreement a covenant by PwC to breach its obligations to Lucent. But this conclusion ultimately need not control, as even an explicit agreement by PwC to use non-public information that came to it in its capacity as Lucent's auditor for the benefit of VTech would be void as against public policy in the absence of fully informed consent by Lucent,[69] and the complaint does not allege any such consent.[70] VTech will not be heard to argue that it is entitled to damages from PwC because PwC failed to live up to an alleged agreement with VTech to sell out another client.

VTech makes a related argument in support of its breach of contract claim that, perhaps, does not depend upon the flawed premise that PwC was contractually obliged to give VTech non-public information. It contends that PwC breached its obligation to supply qualified personnel to work on the engagement because the conflict of interest inherent in its working for both sides disabled its staff from functioning properly. But that contention is reminiscent of the tale of the child who, having murdered its parents, asks mercy as an orphan.

VTech was fully aware of the conflict. It was a substantial company, represented by counsel and engaged in a $121 million acquisition. It had every opportunity to hire consultants who were complete strangers to Lucent. It knowingly chose PwC instead, doubtless in the hope that it would benefit by doing so. If it really thought that PwC was going to give it the benefit of Lucent's non-public information, its behavior was sleazy at best. If it did not, then it has no just complaint. The fact that PwC perhaps ought to have conducted itself more providently changes nothing.

Insofar as they are not grounded in PwC's failure to disclose Lucent's nonpublic information or its alleged conflict of interest, VTech's other allegations of

---

**66.** Young Aff., Ex. 5, Business Advisory Agreement, January 27, 2000, at 7.

**67.** *Ott.v. Ott*, 266 A.D.2d 842, 842, 698 N.Y.S.2d 137, 138 (4th Dept.1999) (quoting *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 199, 36 N.E.2d 106 (1941)).

**68.** *Flushing Nat'l Bank v. Municipal Assist. Corp. for the City of New York*, 52 A.D.2d 84, 88, 382 N.Y.S.2d 764, 767 (1st Dep't), *rev'd on other grounds*, 40 N.Y.2d 731, 390 N.Y.S.2d 22, 358 N.E.2d 848 (1976).

**69.** *See Coffey v. Burke*, 132 A.D. 128, 132, 116 N.Y.S. 514, 517 (2d Dep't 1909); 7 RICHARD A LORD, ET AL., WILLISTON ON CONTRACTS § 16:14 (4th ed.1997).

**70.** VTech does allege that Lucent consented to VTech's engagement of PwC and that certain Lucent financial information was available to it pursuant to Section 5.1 of the Lucent Purchase Agreement. Cpt. ¶¶ 16, 54. But these allegations do not suffice. Consent to VTech's engagement of PwC is quite a different matter from consent to PwC using for benefit of VTech material non-public information concerning Lucent acquired by PwC in its role as Lucent's auditor. Nor does VTech complain that PwC breached the Business Advisory Agreement by failing to use the Lucent information that Lucent made available to VTech in connection with their transaction. Its grievance is that PwC breached by failing to use material non-public Lucent information for VTech's benefit.

breach arguably are sufficient.[71] The claim for breach of the Business Advisory Agreement therefore survives, but only to the extent that it does not allege breach on those bases. It is dismissed in all other respects.

### C. Accountant Malpractice with Respect to the NCAS Audit

VTech's third claim alleges malpractice in regard to the NCAS audit. It asserts that PwC departed from acceptable standards of practice in failing to test whether Lucent's internal guidelines were properly applied to its decision to override the RFMV reserve calculations for certain of its inventory.[72] It alleges further that it justifiably relied on the NCAS audit in purchasing the business and that PwC's negligence impaired its "planning for and implementing its purchase of the Lucent Business and . . . prevented [it] from obtaining a reduction in the purchase price."[73]

#### 1. Proximate Cause

■ PwC contends that the claim fails because VTech will not be able to show that its negligence was a proximate cause of VTech's losses. PwC first argues that VTech purchased the Wired Business prior to receiving the audit opinion and that it therefore would be impossible for VTech to show that PwC caused any of its damages.[74]

VTech here closed on its purchase of the Wired Business on March 31, 2000. It received the purchase price audit a full three months later on June 30, 2000. Accordingly, VTech did not rely on the report in deciding whether to purchase the business.

VTech, however, does not base its claim solely on the purchase of the Wired Business. It seeks also lost profits, as well as consequential and other damages flowing from its alleged inability to seek a reduction in the purchase price and properly manage the Business.

■ PwC counters that VTech sought and obtained a reduction in the Purchase Price in its litigation with Lucent and thus cannot claim that it was unable to do so.[75] But the complaint does not allege anything about VTech's settlement with Lucent or whether this compensated it for its losses as a result of PwC's actions. Accordingly, this defense goes beyond the pleadings and is not properly considered here.

PwC next argues that the claim is barred because VTech's own executives were at fault in misrepresenting that the override of certain inventory reserve calculations had been proper.[76] PwC asserts that since it began the audit after the purchase was complete, the Wired Business executives who told it that the they had taken the override legitimately then were working for VTech. In consequence, it contends, VTech's claim is barred by doctrine announced in *Cenco, Inc. v. Seidman & Seidman,*[77] which held that knowledge of a misrepresentation by a company's own executives is imputed to the company.

The information supporting this argument is not apparent from the complaint. VTech here alleges that "PwC apparently

---

71. *E.g.,* Cpt. ¶ 55(b)-(c).

72. *Id.* ¶ 83.

73. *Id.* ¶¶ 88–89.

74. Def. Mem. 16–17.

75. Def. Reply 6 n. 8 (citing Cpt. ¶ 7).

76. Def. Mem. 18; Def. Reply 7.

77. 686 F.2d 449 (7th Cir.1982).

relied solely on the opinion of Mr. Gumersell that the Management Override was proper."[78] From this statement, it is impossible to determine which company Mr. Gumersell worked for at the time he represented that the override was legitimate.

PwC argues also that Donna Silbert and Robert Gariano, whose testimony about the override in litigation with Lucent is quoted in the complaint, were executives at VTech at the time of the audit.[79] It contends, therefore, that any reliance on its allegedly mistaken report was unreasonable as a matter of law because VTech's own employees knew the truth.[80] The problem once again, however, is that this motion is addressed to the complaint, which does not allege which company these individuals worked for at the time of the audit. Accordingly, on the face of the complaint, their alleged knowledge cannot be imputed to VTech to defeat its claim.

### 2. Damages

PwC next asserts that VTech's claim for consequential damages and lost profits is barred by the contract on two grounds.

First, the audit agreement provides that "[i]n no event shall Pricewaterhouse-Coopers LLP be liable to VTech, whether a claim be in tort, contract or otherwise, for any consequential, indirect, lost profit or similar damages relative to PricewaterhouseCoopers LLP's services provided under this engagement letter,

except to the extent finally determined to have resulted from the willful misconduct or fraudulent behavior of PricewaterhouseCoopers LLP relating to such services."[81]

PwC argues that VTech therefore may not recover any lost profits and consequential damages. As VTech alleges that PwC's actions were willful, however, it states a claim for lost profits and consequential damages.[82]

Second, PwC claims that VTech's assertion of the lost opportunity to take corrective actions is too speculative and uncertain to make out a claim for damages.[83]

■ VTech may obtain lost profits and consequential damages only if they are capable of being measured based on reliable factors.[84] Although VTech does not allege any concrete actions that it was prevented from taking as a result of PwC's alleged misconduct, it may be able to produce evidence to support its claim for damages, however unlikely this may appear at this stage. Dismissal on this ground therefore would be unwarranted.

PwC's motion to dismiss count three therefore is denied, except to the extent that VTech seeks recovery for its purchase of the Wired Business.

### D. Breach of Fiduciary Duty

VTech asserts in its fourth claim that PwC agreed in the Business Advisory

---

**78.** Cpt. ¶ 82.

**79.** Def. Mem. 18 n. 36.

**80.** *See Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 899, 488 N.E.2d 828 (1985).

**81.** Young Aff, Ex. 6, Purchase Price Audit Agreement, at 4–5.

**82.** Cpt. ¶ 88.

**83.** Def. Mem. 13 n. 25.

**84.** *Ashland Mgmt., Inc. v. Janien,* 82 N.Y.2d 395, 402, 604 N.Y.S.2d 912, 915, 624 N.E.2d 1007 (1993); *Kenford Co., Inc. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234 (1986); *Metz v. Coopers & Lybrand,* 210 A.D.2d 624, 626–27, 619 N.Y.S.2d 393, 395 (3d Dep't 1994); *see also Kidder, Peabody & Co. v. IAG Int'l Acceptance Group, N.V.,* 28 F.Supp.2d 126, 130–31 (S.D.N.Y.1998) (collecting cases).

Agreement to "enter into a relationship of trust and confidence concerning the business advisory services"[85] and that it breached this alleged fiduciary duty by (1) failing to disclose its knowledge of Lucent's activities in concealing negative information about the company and (2) refusing to incorporate its knowledge of the Wired Business and its deteriorated condition into the advice it gave VTech under the Business Advisory Agreement.[86] PwC disputes the existence of any fiduciary duty.[87]

In New York, the accountant-client relationship does not generally give rise to a fiduciary relationship absent special circumstances,[88] such as the accountant's commission of active fraud on the client.[89] Even the existence of a consulting relationship does not automatically establish a fiduciary relationship.[90] "A fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity on another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another."[91] Whether a relationship is fiduciary in nature must be determined on the basis of the services agreed to by the parties.[92]

PwC undertook in the Business Advisory Agreement to provide specific transition services to VTech to help integrate its new business into the existing company. It agreed to conduct interviews with senior management, create a "model of important post-deal actions," prioritize key management decisions, launch transition teams, and identify and disarm cultural obstacles to integration.[93] Although PwC agreed to be an advisor to VTech, the services it undertook to render do not suggest that PwC thereby gained a superiority or influence over VTech.

Where, as here, the agreement is incorporated into the complaint, it is not sufficient for VTech simply to assert that there was a relationship of confidence and trust. In any case, no fiduciary duty to which PwC might have been subject would have been justified, much less obliged, it to reveal to VTech confidences reposed in it by Lucent. VTech's claim for breach of fiduciary duty therefore is dismissed.[94]

### E. Aiding and Abetting Lucent's Fraud on VTech

Count five asserts that Lucent made false certifications as to the financial affairs of the Wired Business on January 19,

85. Cpt. ¶ 95.

86. Id. ¶ 110.

87. Def. Mem. 19.

88. See DG Liquidation, Inc. v. Anchin, Block & Anchin, LLP, 300 A.D.2d 70, 71, 750 N.Y.S.2d 753, 753 (1st Dep't 2002).

89. Block v. Razorfish, Inc., 121 F.Supp.2d 401, 403 (S.D.N.Y.2000).

90. See, e.g., Atkins Nutritionals, Inc. v. Ernst & Young, LLP, 301 A.D.2d 547, 549, 754 N.Y.S.2d 320, 322 (2d Dep't 2003).

91. Reuben H. Donnelley Corp. v. Mark I Mktg. Corp., 893 F.Supp. 285, 289 (S.D.N.Y.1995).

92. Northeast General Corp. v. Wellington Advertising, 82 N.Y.2d 158, 163, 604 N.Y.S.2d 1, 4, 624 N.E.2d 129 (1993).

93. Young Aff., Ex. 5, Business Advisory Agreement, at 2–6.

94. See Bridgestone/Firestone v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir.1996). This Court's resolution of the fraud claim with regard to the Business Advisory Agreement renders inapplicable any fiduciary duty based on the special circumstance of active fraud on the client in relation to this agreement.

2000 and again on March 31, 2000 [95] and seeks recovery against PwC for aiding and abetting that alleged fraud. Specifically, VTech alleges that PwC knew that these statements were false, that it failed to disclose that fact and other material adverse changes in the acquired business,[96] and that it rendered substantial assistance to Lucent in committing this fraud by concealing Lucent's activities and providing the statement in footnote eleven of the Circular.[97]

To state a claim for aiding and abetting fraud, VTech must allege (1) the existence of an underlying fraud, (2) that PwC had knowledge of the fraud, and (3) that PwC provided substantial assistance to advance the commission of the fraud.[98] Rule 9(b) applies to this claim and requires that VTech plead these elements with particularity.[99]

PwC asserts that VTech has failed to state a claim because the complaint does not sufficiently allege that PwC had actual knowledge of the alleged fraud and that the facts pleaded do not suggest that it rendered substantial assistance to Lucent.[100]

In an aiding and abetting claim, the requirement of knowledge of the underlying fraud refers to actual knowledge of Lucent's alleged fraudulent activities.[101] VTech alleges that PwC had actual knowledge of Lucent's fraudulent activities by virtue of its role as Lucent's auditor.[102] For example, it alleges that:

> "PwC acquired its knowledge of the falsity of the first and second false ... certifications and the condition of the Lucent Business ... because of its capacity as the Lucent Auditor and because PwC had unlimited access to the books and records, including inventory records, sales forecasts and records of sales, of the Lucent Business." [103]

Yet this alleges only constructive knowledge on the basis of PwC's access to Lucent's books.[104] It does not assert any specific facts that would give rise to an inference that PwC actually knew of Lucent's allegedly fraudulent activities.

Allegations that a defendant should have known of fraud are insufficient.[105] In National Westminster Bank v. Weksel,[106] for

95. Cpt. ¶¶ 115, 117.

96. Id. ¶¶ 121–25.

97. Id. ¶ 126.

98. Wight v. Bankamerica Corp., 219 F.3d 79, 91 (2d Cir.2000); Filler v. Hanvit, 339 F.Supp.2d 553, 557 (S.D.N.Y.2004).

99. See Wight, 219 F.3d at 91.

100. Def. Mem. 22.

101. See Lenczycki v. Shearson Lehman Hutton, Inc., 238 A.D.2d 248, 248, 656 N.Y.S.2d 609, 610 (1st Dep't 1997); accord Wight, 219 F.3d at 91; Kolbeck v. LIT Am., Inc., 939 F.Supp. 240, 246 (S.D.N.Y.1996).

102. Cpt. ¶¶ 120, 124–25, 127, 129.

103. Id. ¶ 129.

104. Although VTech claims repeatedly that PwC had "actual knowledge," such a conclusory allegation is insufficient meet its pleading requirement under Rule 9(b). VTech's allegation that PwC knew that the Wired Business had excess inventory in the Guadalajara, Mexico is not sufficiently connected to the allegedly false certifications made by Lucent on the signing and closing dates of the purchase to satisfy the actual knowledge pleading requirement.

105. See, e.g., Ryan v. Hunton & Williams, No. 99 Civ. 5938(JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000); National Westminster Bank v. Weksel, 124 A.D.2d 144, 149–50, 511 N.Y.S.2d 626, 630 (1st Dep't 1987).

106. 124 A.D.2d 144, 511 N.Y.S.2d 626 (1st Dep't 1987).

example, the Appellate Division held that a plaintiff's allegation that a law firm had access to all of the client's papers did not adequately plead actual knowledge of the client's underlying fraud.[107] Similarly, a court in this Circuit held that an allegation that a bank knew of "red flags" that suggested that its client was using its accounts for fraudulent activities was not enough to satisfy the requirement of actual knowledge.[108]

To be sure, courts have found that a plaintiff sufficiently alleged knowledge on the part of an accounting firm where it claimed that the accountant knew that the client had "severe internal control and reporting problems" or "notice of circumstances raising doubts as to the veracity of . . . information."[109] VTech makes no such specific allegation here however. It claims only that PwC must have known about Lucent's fraud as its auditor. This does not satisfy Rule 9(b). VTech's claim of aiding and abetting fraud therefore is dismissed.

### F. *Fraud and Fraudulent Concealment*

In count six, VTech alleges that PwC committed fraud by (1) misrepresenting the opinion of Lucent with respect to footnote eleven in the Circular,[110] (2) misrepresenting on April 4, 2000 that the Falcon and Osprey products could be sold in the normal course of business,[111] (3) misrepresenting in the Circular whether the Wired Business had been reported upon as a distinct business within Lucent,[112] (4)

knowingly overstating the value of Lucent inventory by $20 million in its audit opinion of June 30, 2000,[113] and (5) later concealing its earlier fraud by asserting that only a forensic audit could uncover Lucent's actions with respect to the management override of the inventory reserve calculations and that PwC could only guess as to the propriety of the override without such an audit.[114]

PwC asserts that this claim fails because several of the allegedly fraudulent statements did not misrepresent or falsely state any facts and therefore cannot form the basis of a fraud claim. It asserts further that VTech did not plead fraud with particularity as required by Rule 9(b) and does not sufficiently allege *scienter*.

1. *False Representations of Material Fact*

a. *Footnote Eleven*

PwC argues that footnote eleven of the Circular was not a misrepresentation of material fact.[115]

The footnote stated that "[i]n the opinion of Management of LTCP [Lucent], no significant events have taken place subsequent to 30th September 30, 1999."[116] According to VTech, this was a misrepresentation of the March 1, 2000 letter from Lucent, which stated:

"[t]o the best of our knowledge and belief, no events have occurred subsequent to 30th September, 1999 and through

---

**107.** *Id.* at 149–50, 511 N.Y.S.2d at 630.

**108.** *Ryan*, 2000 WL 137526 *9.

**109.** *Houbigant, Inc. v. Deloitte & Touche LLP*, 303 A.D.2d 92, 99, 753 N.Y.S.2d 493, 498–99 (1st Dep't 2003) (collecting cases and examples).

**110.** Cpt. ¶¶ 149, 179.

**111.** *Id.* ¶¶ 149, 160.

**112.** *Id.* ¶ 184.

**113.** *Id.* ¶¶ 150–59.

**114.** *Id.* ¶¶ 162–65.

**115.** Def. Mem. 25.

**116.** Cpt. ¶ 22.

the date of this letter that would require adjustment to or disclosure in the combined financial information, except for the U.S. $2.2 million adjustment to the warranty provision which has been reflected in the combined financial information and the sale of the Wired Business to VTech." [117]

Although as VTech alleges in Count One, PwC may have been negligent in failing to investigate the accuracy of this opinion, the footnote does not misstate the representation letter upon which it was based.[118]

### b. The April Statement

PwC contends that its statement on April 4, 2004 that the Falcon and Osprey telephone products in the Guadalajara warehouse could be sold "in the ordinary course of business utilizing pricing action and promotional programs" [119] was an opinion regarding future sales expectations. It argues that such an opinion cannot be the basis of a fraud claim.

To state a claim for fraud, a plaintiff generally must allege that the defendant made a false statement of material fact. An opinion, however, may be actionable where the plaintiff alleges that the defendant made the statement knowing it was false.[120]

VTech here asserts PwC knew that the statement "was false because of the physical stocktake of inventory and the general decline in the Lucent Business." [121] But this conclusory allegation does not support its claim. It is unclear why a general decline in the Wired Business—which PwC allegedly knew of as Lucent's auditor— indicates that PwC *knew* also that its statement that the telephones could be sold in the ordinary course of business through pricing action and promotions was false. Indeed, PwC's qualification that promotional incentives and pricing action would be required to sell the products suggests that it took into account the general decline of the Wired Business in opining about their marketability. In all the circumstances, VTech's complaint does not sufficiently plead that the statement did not actually represent PwC's opinion about the Falcon and Osprey products.

### c. The Standalone Accounts

PwC next challenges VTech's claim that the statement that "no accounts have previously been prepared for the Wired Business on a stand-alone basis as the Wired Business has not been reported upon as a distinct business within Lucent" [122] was a misrepresentation. VTech claims that this statement was false because Lucent's accounts were maintained with a software program that allowed the financial information of the Wired Business to be extracted for analysis.[123]

PwC first asserts that this statement was made in the Circular issued by PwC Hong Kong and therefore cannot be attributed to it. VTech, however, claims that PwC provided this statement to PwC Hong Kong.[124] For purposes of this motion, this is assumed to be true.

---

117. *Id.* ¶ 24.

118. *Id.*

119. *Id.* ¶ 50.

120. *CPC Int'l, Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 286, 519 N.Y.S.2d 804, 813, 514 N.E.2d 116 (1987); *Channel Master Corp. v. Aluminium Limited Sales, Inc.*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958).

121. Cpt. ¶ 183.

122. *Id.* ¶ 184.

123. *Id.* ¶ 20.

124. *Id.* ¶ 19.

PwC contends that, even if it made this statement, it was not false. It claims that the fact that a software program could be used to evaluate financial data regarding the Wired Business does not mean that Lucent went the "extra step of publishing separate accounts."[125] Indeed, VTech does not allege that Lucent published separate accounts. Its allegation is only that separate accounts of the Wired Business could have been made available even if not previously published by Lucent. In other words, it argues that PwC's statement purposefully left it with the erroneous impression that the Wired Business could not be analyzed as a distinct business.

A statement that is ambiguous or a half-truth may ground liability in fraud if the speaker knows it to be materially misleading and does nothing to correct the misunderstanding.[126] The fact that aspects of its representation about whether the Wired Business was reported as a distinct business were literally accurate therefore does not preclude the possibility that PwC nonetheless consciously could have misled VTech with its statement. The statement therefore affords a sufficient basis at this stage for a fraud claim, assuming other requirements are satisfied.

### 2. Scienter

To satisfy Rule 9(b), the pleading must assert facts from which a strong inference of fraud may be drawn.[127] "A strong inference of fraudulent intent is made out 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"[128]

PwC asserts that VTech's complaint is insufficient because it does not adequately plead *scienter*. The question here is whether VTech's allegations of conscious misbehavior or, as PwC obviously had the opportunity to commit fraud, motive are sufficient.

VTech alleges that PwC had a motive to misrepresent Lucent's true financial picture because it had a conflict of interest and sought to favor its relationship with Lucent over that with VTech.[129] It argues that PwC did not want to be the "catalyst which would cause Lucent to lose its deal with VTech by exposing the impropriety of the Management Override."[130]

Although it was disclosed, this conflict of interest reasonably could have supplied a motive for PwC's alleged misrepresentations.[131] As VTech's allegation of motive and opportunity adequately pleads *scienter*, the Court does not consider its claims of conscious misconduct by PwC. Accordingly, PwC's motion is denied to the extent

---

**125.** Def. Mem. 9 n. 14.

**126.** *See, e.g., Downey v. Finucane,* 205 N.Y. 251, 264, 98 N.E. 391 (1912); *Sheridan Drive–In, Inc. v. State,* 16 A.D.2d 400, 408, 228 N.Y.S.2d 576, 585 (4th Dep't 1962).

**127.** *E.g., Chill v. General Electric Co.,* 101 F.3d 263, 267 (2d Cir.1996); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812 (2d Cir.1996); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

**128.** *First Capital Asset Mgmt., Inc. v. Brickelbush,* 150 F.Supp.2d 624, 632 (S.D.N.Y.2001)

(quoting *Hallwood Realty Partners v. Gotham Partners, L.P.,* 95 F.Supp.2d 169, 174 (S.D.N.Y.2000) (in turn quoting *Shields,* 25 F.3d at 1128)).

**129.** Cpt. ¶¶ 160, 171.

**130.** *Id.* ¶ 181.

**131.** *See Podany v. Robertson Stephens, Inc.,* 318 F.Supp.2d 146, 157 (S.D.N.Y.2004) (disclosed conflict of interest may still serve as a motive for fraud).

that PwC claims fraud on the basis of the standalone accounts statement and its audit opinion of June 30, 2000.

### III

For the foregoing reasons, PwC's motion to dismiss the Second Amended Complaint is converted into a motion for summary judgment on the limited issue of the authenticity of the engagement letters and otherwise treated as a Rule 12(b)(6) motion. The Court determines that the engagement letters are authentic. It therefore considers them on the motion to dismiss. The motion to dismiss is granted as to counts four and five, so much of count two as seeks recovery for PwC's failure to disclose or incorporate non-public Lucent information and conflict of interest, so much of count three as seeks recovery for VTech's purchase of the Lucent Wired Business, and so much of count six as asserts fraud on the basis of statements other than whether the Wired Business could be reported on as a distinct business and the audit opinion of June 30, 2000 all are dismissed. The motion is denied in all other respects.

SO ORDERED.